### BRINK v. CANFIELD et al.

No. 8837—Opinion Filed June 17, 1919.

Rehearing Denied Feb. 10, 1920.

Motion to Correct Opinion Overruled April 24, 1920.

1. **Judgment—Dismissal With Prejudice— Effect as Bar to Rights of Plaintiff's Heir in Subsequent Suit—Title to Indian Land.**

The dismissal with prejudice of an action brought by a full-blood Indian heir to recover inherited allotted lands, to quiet title, and for damages on account of wrongful detention, followed by an order of court denying an application to set aside such dismissal and to reinstate the action, and from which no appeal was taken, where, at the time the action was instituted, no conveyance of the lands had been made or attempted, though thereafter and prior to the adverse order of the court a conveyance was made, and in which action the validity of the deed was neither involved nor determined, may not be set up in bar of the rights of the heir of such plaintiff in a suit to which she is made a party, and in which the validity of the subsequent deed was a material issue.

2. **Same.**

Such dismissal, or any order or judgment made in the case not associated with or related to the making of a conveyance or the approval thereof, is without effect, and void for want of authority in the heir to thus divest himself of title, and for lack of power in the court to render an effective judgment, and hence is not available as a defense, either as a plea in bar or as an estoppel in a subsequent action in which the mother, who succeeded to the estate of the deceased heir, is a party.

3. **Cancellation of Instruments — Inadequacy of Consideration.**

Ordinarily, mere inadequacy of consideration is not of itself a sufficient ground to

warrant the cancellation of an instrument affecting real estate; yet, where the inadequacy is so gross as to shock the conscience and to furnish satisfactory and decisive evidence of fraud, it will be a sufficient ground for canceling a conveyance or contract, whether executed or executory. Where, however, the inadequacy of consideration is accompanied by other inequitable incidents and shows bad faith, such as concealments, misrepresentations, and undue advantage on the part of the one who obtains the benefit, or ignorance, weakness of mind, incapacity, pecuniary necessities, and the like, on the part of the other, these circumstances, combined with inadequacy of price, will much more readily induce a court to grant relief, defensive or affirmative.

**4. Deeds — Cancellation — Inadequate Consideration—Ignorant Indian Grantor—Agency of Recently Discharged Guardian.**

Courts regard with extreme disfavor the action of parties in procuring a recently discharged guardian to act as agent for them in procuring, from the lately emancipated minor, a deed to lands inherited by him. Even though proof of dependence on the one side and influence on the other is wanting, where it appears that the deed was procured for a price wholly disproportionate to the value of the land, the former ward being an illiterate full-blood Indian, addicted habitually to the excessive use of intoxicating liquors, unacquainted with land values, or the value of land for oil and gas purposes, discharged from guardianship but a few months before, and who was deceived as to his rights as an heir, the court will unhesitatingly grant the heir of the wronged party relief against those chargeable with such unconscionable practices.

**5. Vendor and Purchaser—Constructive Notice.**

Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself.

**6. Indians—Lands—Bona Fide Purchasers —Evidence.**

Record examined, and held, that the defendants each, except C. E. R., had either actual knowledge or constructive notice of the rights and equities of J., who, as his father's heir, shared in the estate of his deceased half-sister, and are therefore not bona fide purchasers for value, entitled to protection against the heir of J. in a suit involving the validity of a conveyance by J. in his lifetime.

Error from District Court, Creek County; Ernest B. Hughes, Judge.

Action by Lolly Jack, through his guardian, John Tiger, against George W. Can-field, D. A. McDougal, L. O. Lytle, Charles J. Wrightsman, and others, with intervention by Lusanna Brink. Judgment for plaintiff Lolly Jack, and against intervenor, dismissing her cross-petition with prejudice, and in favor of defendants McDougal and Lytle, and intervenor brings error. Judgment for McDougal and Lytle affirmed and judgment against intervenor reversed without prejudice to rights of defendants Charles J. Wrightsman and others, and cause remanded for further proceedings.

W. V. Pryor, C. B. Rockwood, and McDougal, Lytle & Allen, for plaintiff in error.

McGuire & Devereux and Chas. W. Grimes, for defendants in error Geo. W. Canfield, O. M. Lancaster, Chas. W. Grimes, J. H. Cacy. John Z. Cacy. Rhoda Cacy, G. M. Canterbury, Rudolph Cacy, Samuel Waller, Maurice E. Peteet. Clara A. Ryan, Walter L. Ransom, J S. Cosden, and E. W. Sinclair.

SHARP, J. Susie Crow, the daughter of Kernel Jack and Sina Crow, was born in the month of October, 1898, and died intestate in the month of September, 1899. After her death, her name was duly enrolled by the Commission to the Five Civilized Tribes as a full-blood Creek Indian citizen, under authority of section 28 of the act of Congress approved March 1, 1901 (31 Stat. at L. 861), commonly known as the Original Creek Agreement, and during the year 1905 there was selected in her right and allotted to the use of her heirs the south half of the southwest quarter and the west half of the southeast quarter of section 4, township 18 north, range 7 east, in what is now Creek county, Okla. Prior to his marriage with Sina Crow, Kernal Jack was married to Lusanna Brink, of which marriage one child, Wallace Jack, was born. Kernal Jack was also married to one Toche Grayson, by whom he had one child, the plaintiff, Lolly Jack.

Sina Crow, the mother of Susie Crow, died on or about the 15th day of August, 1899. Afterward, and during the year 1909, Kernal Jack died. Some time during the spring of 1913, Wallace Jack died. The heirs of Susie Crow on the paternal side are Lolly Jack, the half brother of Susie Crow, and Lusanna Brink, the sole surviving heir at law of Wallace Jack, son of Kernal Jack, deceased. On February 11, 1915, Lolly Jack, claiming to be the sole surviving heir at law of Susie Crow, deceased, through his guardian, John Tiger, instituted in the district court of Creek county an action against Charles J. Wrightsman and 58 other defendants to recover possession of the lands allotted in the name of Susie Crow, for damages in the sum of $500,000, and for an accounting for the oil and gas produced and removed

therefrom. Among those named as defendants were Geo. W. Canfield, Thomas Mogan, John Z. Cacy, Walter L. Ransom, G. M. Canterbury, Rhoda Cacy, Chas. W. Grimes, O. M. Lancaster, Samuel Waller, Maurice E. Peteet, and Clara A. Ryan.

Leave of court being obtained on November 16, 1915, Lusanna Brink, alleging that she was the sole and only heir at law of Wallace Jack, deceased, filed therein her plea of intervention, claiming title to the Susie Crow allotment, damages in the sum of $1,000,000 on account of oil and gas removed from the premises, and prayed for the cancellation of a quitclaim deed made by Wallace Jack during his lifetime to John Z. Cacy, and also the cancellation of certain other instruments affecting her title not necessary to set out. Upon issues joined between the original parties and those subsequently made parties to the suit, the case proceeded to trial, resulting in a judgment in Lolly Jack's favor for an undivided one-fourth interest in the lands and the oil and gas royalties, and against intervenor, Lusanna Brink. McDougal & Lytle, defendants in the suit, were given a decree for a one-eighth interest in the lands and royalties accruing therefrom, on account of an attorney's contract made with them by Wallace Jack on January 22, 1913. As the only appeal prosecuted from the decree of the trial court is that of Lusanna Brink, it is unnecessary to consider the decree in other respects. No attack on that portion of the judgment in favor of McDougal & Lytle is made in the proceedings in error of Lusanna Brink in the separate appeal prosecuted by her. Nor is there longer any controversy between Lusanna Brink and Lolly Jack, as on March 27, 1917, the parties named filed in this court their stipulation that the judgment of the trial court should, as to them, be affirmed, and which stipulation was on the same day approved and judgment entered pursuant thereto.

The case here presented involves only the rights of Lusanna Brink, mother of Wallace Jack, to recover the estate that ascended to Kernal Jack upon the death of his daughter, Susie Crow, and which at his death descended to his son, Wallace Jack. The title of the maternal heirs and those claiming through and under them is involved and this day decided in case No. 8793, Geo. W Canfield et al. v. Lolly Jack et al., 78 Okla. 127, 188 Pac. 1040. Only the title of the paternal heirs and those claiming through or under them is involved in this case. At the beginning of the case, it was contended by those adversely interested that the entire estate ascended to the grandmother, Orla or Fannie Fulsom, and aunts, Mollie Tiger and Babie Barnett, of Susie Crow, and this position was insisted upon by them throughout the trial. It is now admitted that a one-half interest in her estate passed to her father, Kernal Jack, and consequently at his death, to his heirs at law. We may therefore enter upon the consideration of the case with the relationship of the parties no longer in controversy. The first question, then, is: Did Lusanna Brink, or did her son, Wallace Jack, during his lifetime, convey her or his one-fourth interest in the estate? On the part of plaintiff in error, it is insisted that he did not, while on the other hand, the defendants in error Canfield, Lancaster, Grimes, Canterbury, Waller, Peteet, Ryan Ransom, Sinclair, Cosden, and the Cacys make the contention that on account of a deed of conveyance of February 17 1913, from Wallace Jack to John Z. Cacy, and the dismissal on the same day of an action brought by him on January 24, 1913, against John Z. Cacy, Thomas Mogan, Geo. W. Canfield, and "Oral" Fulsom, and which action the district court afterward refused to reinstate, as well as by certain deeds made by Lusanna Brink to Lancaster and Grimes, and Mogan, Cosden, and Sinclair, to a portion of the lands, Lusanna Brink had no title and was not entitled to recover.

All of the heirs of Susie Crow were full-blood Creek Indians. Hence their deeds to allotted lands inherited by them required the approval of the court having jurisdiction of the settlement of the estate of the deceased allottee, as held in the companion case of Canfield v. Jack. The deed of February 17, 1913, from Wallace Jack to John Z. Cacy, was approved by the county court of Creek county February 21, 1913, and will be considered later. On January 22, 1913, Wallace Jack, claiming to be the owner in fee of the lands allotted to Susie Crow, entered into a contract with the law firm of McDougal & Lytle, the purpose of which was the institution of legal proceedings for the recovery thereof. This contract was executed, approved by the county court, and placed of record in the office of the register of deeds of Creek county on the day of its execution. On the 24th day of January, 1913, pursuant to terms of their employment, McDougal & Lytle brought suit in the district court of Creek county on behalf of their client, Wallace Jack, against John Z. Cacy, Thomas Mogan, Geo. W. Canfield, and "Oral" Fulsom. The petition set out three causes of action: the first in ejectment, the second to quiet title, and the third for damages on account of the unlawful detention of the premises by defendants. On February 17, 1913, Jack filed in the suit his dismissal

thereof, with prejudice. This motion was filed without notice or knowledge thereof on the part of his attorneys, McDougal & Lytle, and was procured to be made at the instance of his former guardian, F. S. Lozier. On May 3, 1913, Wallace Jack filed his motion to set aside, vacate, and hold for naught his previous dismissal, and to reinstate his cause of action on the ground that action therein was brought about by means of intoxicating liquors furnished him by defendants, whereby he became intoxicated and did not "know the nature, purpose, and intent of his act" in filing the dismissal of his suit, or of the deed made contemporaneously therewith; further charging that the only consideration paid him therefor was the sum of $50, which amount plaintiff tendered into court. On May 31, 1913, Wallace Jack's motion to set aside the dismissal and to reinstate his cause of action was overruled, and no appeal from the order was ever prosecuted.

The court below found, in the trial of the case from which the present proceedings in error were prosecuted, that Wallace Jack died intestate in the month of May, 1913, the exact date of his death not being definitely found. If, in fact, Wallace Jack died prior to May 31st, the day on which the order was made (and the evidence tends strongly to show that he did), there being no revivor of the action, the order, or judgment, would probably for that reason be void. Assuming, however, that Jack died on the same day, but after the order was made, what is its legal effect? At the time of the institution of his action. it will be remembered that Jack had not given the Cacy deed. Hence its validity was in no wise involved in his suit. While in the motion to vacate and set aside his dismissal, and to reinstate his action, the making of the deed on February 17. 1913, was referred to, it was done only as a matter of inducement, and did not put in issue the validity of the deed. Nor did the judgment of the court refusing to set aside the dismissal and to reinstate his action undertake to pass upon the effect of the deed, which, as we have seen, was not made until some weeks after the suit was instituted. On June 30, 1911, Orla Fulsom, claiming to be the sole heir at law of Susie Crow, had attempted to sell and convey the entire tract of land to J. H Cacy. who in turn sold it to his brother, John Z. Cacy. Afterward, and on the 25th day of March, 1912, John Z. Cacy had executed a deed to Geo. W. Canfield to 40 acres of the land, and on August 12, 1912, Cacy conveyed to Thomas Mogan another 40 acres out of the land. Doubtless on account of these conveyances, and the prior claim of absolute ownership of Orla Fulsom,

the latter, together with John Z. Cacy, Thomas Mogan, and Geo. W. Canfield, were made defendants in the suit.

It was to determine his rights as one of the heirs of Susie Crow, against the defendants named, that his suit was brought, and not for a rescission of his subsequent contract, or a cancellation of his deed. No claim is made that the petition was amended or the issues other than as tendered in the original petition. The dismissal of Jack's suit, and the order overruling his application to reinstate, being set up in bar of the claim of the heir, Lusanna Brink, by John Z. Cacy and assigns, what, then, is its legal effect, and does it conclude the latter of her title as heir?

The inquiry is readily answered by the decisions of this court in Jefferson v. Winkler, 26 Okla. 653, 110 Pac. 755; Bell v. Fitzpatrick, 53 Okla. 574, 157 Pac. 334; and by other cases. And by the Circuit Court of Appeals in Goodrum v. Buffalo, 162 Fed. 817, 89 C. C A. 525; and Bowling v. United States, 191 Fed. 19, 111 C. C. A. 561, the latter case being affirmed on appeal by the Supreme Court of the United States in 233 U. S. 528, 34 Sup. Ct. 659, 58 L. Ed. 1080. At the time Jack's suit was instituted, there was but one way in which he could alienate his title to the lands which he had inherited, and that was by a deed of conveyance, approved by the court having jurisdiction of the settlement of the estate of the deceased, allottee. 35 Stat. at L. 312, c. 199. While the restrictions had been removed from the lands in the sense that Jack had the power of alienation, it could only be consummated and made effectual when approved as pointed out in the foregoing act of Congress. Without the making of a deed, and its approval, no judgment could be rendered, regardless of the character of the suit or the issues joined, whereby Jack's title could be divested. he being a full-blood Creek Indian, and the lands being lands allotted to his kinsman, through whom, upon the death of succeeding heirs, his title was derived. Nor could the judgment be given effect in a subsequent legal proceeding, either as an estoppel or as constituting a former adjudication of his title. In other words, in so far as the title to such lands was concerned, the judgment was a nullity, because of a want of power in the court to make it. Any other view would mean the circumvention of the statute prescribing the manner in which such lands may be alienated, and make nugatory the acts of Congress prescribing the manner and terms of conveyances of allotted lands inherited by full-blood Indians.

The next question for our consideration is the effect to be given the Wallace Jack deed of February 17, 1913, to John Z. Cacy. This deed is in form a quitclaim deed, and recites a cash consideration of $50. No other or additional consideration was in fact paid. This deed Lusanna Brink charges to have been fraudulently procured, and that the consideration therefor was unconscionable, in view of the true value of the lands at the time. Some years prior to the making of the deed and on January 12, 1910, to be exact, the county court of Creek county had appointed F. S. Lozier guardian of the person and estate of Wallace Jack, then a minor. Jack attained his majority on October 25, 1911, and on the 6th day of April, 1912, Lozier, having filed his final report, was discharged as his guardian. In her supplementary answer and reply, Lusanna Brink charged that the deed of conveyance from Wallace Jack was obtained by and through the instigation and connivance of the "claimants" of the legal title of the lands, and by their agent, F. S. Lozier; that, because of the previous relationship of guardian and ward, Jack relied upon and took the advice of his former guardian in all business transactions; that Jack did not know of the value of the land, either for agricultural or oil and gas mining purposes; and that it was represented to him the land was of little, if any, value, and that he did not have any interest therein, as his father, Kernal Jack, was not an heir of Susie Crow. The representations so made, it was charged, were at the time known by the makers thereof to be false, but were believed by and relied on by Jack; and that the land at the time was reasonably worth $100,000, and it was because of the fraud thus practiced upon Jack that the quitclaim deed from him to Cacy was obtained. The evidence fairly tends to support the charge that not only did Lozier, acting as the agent of Cacy, and perhaps of Mogan and Canfield, procure the execution of the deed, under the circumstances charged, but that he also induced Jack on the same day to file the dismissal, and to abandon interest in the subsequent efforts of his attorneys to procure the vacation of the dismissal and the reinstatement of the case. That he was induced to believe he had no interest in the land, on account of Cacy and those claiming title to the premises through him, is not surprising, and finds strong support in view of the fact that these parties consistently throughout the proceedings in the lower court contended that the maternal grandmother and aunt of Susie Crow inherited the entire allotment. Upon the issues of fraud, undue influence, and unconscionable consideration, the trial court found:

"The courts of the state have severely condemned the acts of guardians, and those who have recently been guardians, of Indians, in obtaining from them deeds, either for themselves or for and on behalf of others. The court is brought to this conclusion: That whatever deed Wallace Jack made to Cacy was obtained from him through the undue influence of his guardian, Lozier, and that the consideration, to wit, $50, paid to Wallace Jack, was unconscionable and inadequate, and that such undue influence would vitiate the entire contract, so far as those persons who took the deed have notice of such lack of consideration and undue influence."

This finding of the court, being a part of the record in this case, though not contained in the case No. 8793, Geo. W. Canfield et al v. Lolly Jack et al, not only correctly summarizes the facts (of which there is little dispute), but states a rule of law in full consonance with the highest principles of equity. In Daniel v. Tolon, 53 Okla. 666, 157 Pac. 756, the question of a recently discharged guardian in a transaction with his former ward was under consideration. While the case differs slightly from the case at bar, in that there the former guardian himself purchased the land of his late ward, the rule is applicable in a case where a former guardian is employed as the agent of others to deal with the recently emancipated minor; the controlling fact being that of the past relation of dependence and the influence exerted, and not the personnel of the parties for whom the contract or deed is made. As said in the Tolon case, courts watch with great jealousy transactions of guardians with their wards, or any dealings between them affecting the estate of the ward. From the confidential relations between them, it will be presumed that the ward was acting under the influence of the guardian, and all transactions between them prejudicially affecting the interests of the ward will be held to be constructively fraudulent. This presumption extends to transactions between them after the guardianship has ended, but where the influence remains, and the control and dominion over the former ward's property still continues. The general doctrine of equity applicable to the relation between guardian and ward applies to the parties after the legal condition of guardianship is ended, and as long as the dependence on one side and influence on the other presumptively, or in fact, continues. Any conveyance, purchase, sale, or contract by which the guardian derives a benefit at the expense of the former ward, made after the termination of the legal relation but while the influence lasts, is presumed to be invalid and voidable, and in such case the burden

rests heavily upon the guardian to prove all the circumstances of knowledge, free consent, good faith, absence of influence, which alone can overcome the presumption. The proof tends to show that Wallace Jack was addicted to the excessive use of intoxicating liquors, and was in an inebriated condition much of the time. His aunt, Katie Painkiller, sometimes known as Katie Watashe, testified that Wallace Jack died in April, 1913, at her home, and in answer to questions propounded her stated:

"Q. Did you see him constantly? A. Yes, sir. Q. How was he about drinking during the last years of his life? A. Well, he drank all the time; I guess that is what killed him. Q. He was almost constantly drinking, was he? A. Yes, sir."

Jennetta Tiger testified in part as follows:

"Q. Did you know Wallace Jack the last year of his life? A. Yes, sir. Q. What was his condition as to drink or otherwise? A. Why he drank a good deal. He was drunk over half of his time."

There was evidence, on the other hand, that at the time Jack executed the deed he was sober. At the time the deed was made the land was worth, according to the testimony, from $10,000 to $20,000. Some of the witnesses valued it at a much higher value. The case, in short, presents the situation of an illiterate full-blood Indian, recently discharged from guardianship, who was drunk a good portion of the time, unacquainted with land values, or of the value of land for oil and gas purposes, whose right to an inheritance, through the death of succeeding heirs, was denied him by his former guardian, the representative in bringing about a dismissal of his suit against the parties with whom he was in litigation, and who contemporaneously therewith made a quitclaim deed, which if upheld would convey his entire title to such inheritance, to one of his adversaries for a nominal consideration of $50, while in fact such heir was the owner of an unincumbered one-fourth interest in an estate worth from two hundred to four hundred times the price paid.

It does not matter that Cacy and those interested with him, or claiming title to the lands through him, may have honestly believed that Jack had no interest as an heir in the lands, as the case does not depend upon the question of good faith. If, through their agents, Cacy and others induced Jack to believe that he had no such interest, then a fraud was perpetrated upon him, irrespective of any motive which may have prompted them. The case presents a situation somewhat similar to that in Wheeler v. Smith et al., 9 How. 55, 13 L. Ed. 44. There Wheeler sought to have set aside a certain contract or agreement by which he had relinquished certain rights in his uncle's estate and refrained from contesting the will. He had been induced by the executors, men of high character, to execute the agreement. One of them, a lawyer, advised Wheeler that in his opinion the will was valid, and that the compromise was made to avoid litigation. Wheeler, it seems, had studied law, but was not familiar with business affairs, was inefficient and dependent, and easily misled, especially by those for whose ability and character he entertained a profound respect. While the court found that the executors acted under a sense of duty, from a misconception of their power under the will, it was held that in making the compromise the parties did not stand on equal ground; that the necessities and character of the complainant were well known to the executors; having the confidence expressed in the validity of the devise, they could hardly have felt themselves authorized to pay to the complainant $25,000 for the relinquishment of a pretended right. It was said:

"It appears to us that the agreement, under the circumstances, is void It cannot be sustained on principles which lie at the foundation of a valid contract. The influences operating upon the mind of the complainant induced him to sacrifice his interest. He did not act freely, and with a proper understanding of his rights."

Ordinarily, mere inadequacy of consideration is not of itself a sufficient ground to warrant the cancellation of an instrument affecting real estate; yet where the inadequacy of price is so gross that it shocks the conscience, and furnishes satisfactory and decisive evidence of fraud, it will be a sufficient ground for canceling a conveyance or contract, whether executed or executory. Paulter v. Manuel, 25 Okla. 59, 108 Pac. 749; Bruner v. Cobb, 37 Okla. 228, 131 Pac. 165, L. R. A. 1916D, 377; Bilby v. Diamond, 71 Oklahoma, 174 Pac. 758. The disproportion between the value of the land and the price paid Jack is so great as to shock the conscience of a court of equity, and to call for its active interposition in aid of the wronged party. Time and again this court has denounced in no uncertain terms transactions of this character and afforded relief against those guilty of such practices. But we are not required to rest the case upon mere inadequacy of consideration alone, though gross and unconscionable it is, as there are other equitable grounds upon which relief may be afforded. Where inadequacy of consideration is coupled with other inequitable incidents, courts of equity will much more readily afford relief than in cases depending on inadequacy alone. When

the accompanying incidents are inequitable and show bad faith, such as concealments, misrepresentations, undue advantage, ignorance, weakness of mind, incapacity, pecuniary necessity, and the like on the part of the wronged person, these circumstances, combined with inadequacy of price, will afford grounds for a court of equity to grant relief, defensive or affirmative. Correctly speaking, such facts do not constitute an absolute and necessary ground for equitable interposition. They operate to throw the heavy burden of proof on the parties seeking to enforce the transaction, or claiming the benefits of it, to show that the other acted voluntarily, knowingly, intentionally, and deliberately, with full knowledge of the nature and effects of his acts, and that his consent was not obtained by any oppression, undue influence, or undue advantage taken of his condition, situation, or necessities. Pomeroy's Eq. Jur., sec. 928. The Roman law adopted a fixed standard by which to determine all cases of inadequacy, which was one-half of the real value of the subject-matter when that consisted of immovable property. If the price was less than one-half of the real value, the seller could compel the buyer either to rescind, restore the thing and take back the price, or to affirm and make up the deficiency. Code lib. 14, tit. 44, sec. 2; Nott v. Hill, 2 Cas. Ch. 120; Burrowes v. Lock, 10 Ves. 470, 474. The French law is to the same effect. Such arbitrary rules, however, are entirely contrary to the spirit of our law and our methods of administering justice. To conclude that Jack would have conveyed his entire interest in his rich estate to a stranger for $50, knowing and appreciating its true value, is to convict him of being a fool, and, if a fool, surely his deed cannot be binding.

Finally, it is claimed that the defendants are innocent purchasers. What particular defendants are entitled to the benefit of this defense, counsel fail to make clear. It is urged that the following deeds were made for value and without notice after the deed of Wallace Jack to John Z. Cacy, on February 17, 1913: The quitclaim deed from John Z. Cacy and Rhoda Cacy to Chas. W. Grimes and O. M. Lancaster of October 26, 1914; the quitclaim deed from Lusanna Brink and Katie Painkiller to Chas. W. Grimes and O. M. Lancaster to the north 60 acres of the west half of the southeast quarter of section 4, township 18 north, range 7 east; and a second quitclaim deed, executed on the same day by Lusanna Brink and Katie Painkiller to Geo. W. Canfield, Samuel Waller, Maurice E. Peteet, and John Z. Cacy to the south half of the southwest quarter of the southeast quarter of the aforementioned section;

and the quitclaim deed of Thomas Mogan to J. S. Cosden of May 3, 1915. The deeds from Brink and Painkiller were never approved by the county court, and it is sufficient to say for that reason were ineffectual to pass the title to the lands therein described. There is no affirmative pleading setting up that any of the defendants were innocent purchasers. Primarily, at least, their defense was based on the title acquired by them through conveyances from the maternal heirs, the deed from Wallace Jack and the deeds from Lusanna Brink and Katie Painkiller being taken merely to avoid litigation, and, as claimed, "to buy their peace."

The rights accorded a bona fide purchaser for value are an affirmative defense. Bruce v. Overton, 54 Okla. 350, 154 Pac. 340. The requirements, both as to the pleadings necessary and the proof required to establish such defense, are interestingly considered in Boone v. Chiles, 10 Pet. 177, 211, 9 L. Ed. 388, 400, and Wright-Blodgett Co. v. United States, 236 U. S. 397, 35 Sup. Ct. 339, 59 L. Ed. 637. In order to constitute one a bona fide purchaser, three things must exist: (1) A purchase in good faith; (2) for value; (3) without notice. Adams Oil & Gas Co. v. Hudson, 55 Okla. 386, 155 Pac. 220. While we recognize the rules necessary to establish the rights of a bona fide purchaser, we are not disposed, in the circumstances of the case and on account of the great amount involved, to base our opinion upon technical rules of pleading, or upon the ground that the burden of proof rested upon one party or the other, as these questions do not appear to have been urged in the trial court. We believe the evidence fully authorizes the conclusion that none of the grantees, unless it be Clara A. Ryan, in the several deeds were innocent purchasers. If, of course, the parties were bona fide purchasers for value and without notice, their rights would not be affected by the fraud of their grantor. Doye v. Carey, 3 Okla. 627, 41 Pac. 432; Miller v. Barnett, 49 Okla. 508, 153 Pac. 641; Fletcher v. Peck, 6 Cranch, 87, 133, 3 L. Ed. 162, 177. In such case, the fraud gives rise only to a personal claim. Fidelity Mutual Life Insurance Co. v. Clark, 203 U. S. 64, 27 Sup. Ct. 19, 51 L. Ed. 91.

An intelligent consideration of the rights of the several grantees involves a reference to the respective deeds taken by them. The first deed was that of Orla Fulsom to J. H. Cacy to the entire 160-acre tract, and is dated June 30, 1911. Second, the deed of March 25, 1912, from J. H. Cacy and Lucy Cacy, his wife, to John Z. Cacy to the entire tract. Third, the deed from John Z. Cacy and Rhoda Cacy, his wife, dated March 25,

1912, to Geo. W. Canfield to the southwest quarter of the southwest quarter. Fourth, the deed of August 12, 1912, from John Z. Cacy and Rhoda Cacy, his wife, to Thomas Mogan to the southeast quarter of the southwest quarter. Fifth, a quitclaim deed of January 13, 1914, by Molly Tiger and Babie Barnett to the entire 160-acre tract, and which deed, except as to the southeast quarter of the southwest quarter, was approved by the county court of Creek county on March 3, 1915, and by subsequent order of the county court on February 8, 1916, approved in its entirety. These deeds were from the maternal heirs, and, of course, did not affect the title of the heirs in the paternal line. The remaining deeds were executed after February 21, 1913, the date of the approval of the Wallace Jack deed: Quitclaim deed of April 20, 1914, from John Z. Cacy and Rhoda Cacy, his wife, to Geo. W. Canfield to an undivided one-half interest in and to the south half of the southwest quarter of the southeast quarter; quitclaim deed of May 20, 1914, from John Z. Cacy and Rhoda Cacy, his wife, to Samuel Waller and Morris E. Peteet to an undivided one-fourth interest in and to the south half of the southwest quarter of the southeast quarter; special warranty deed of October 26, 1914, from John Z. Cacy and Rhoda Cacy to Chas. W. Grimes and O. M. Lancaster to the northwest quarter of the southeast quarter and the north half of the southwest quarter of the southeast quarter; quitclaim deed of May 3, 1915, from Thomas Mogan to J. S. Cosden to the southeast quarter of the southwest quarter.

A purchaser of land, who buys in reliance on the record title, is chargeable with all the notice brought to him by the records; and if the record contains matters that would put a person of ordinary prudence upon inquiry into the nature of the title of the grantor, or of the rights and equities of a former owner, then the law charges such purchaser with all the knowledge an inquiry upon his part, prosecuted with reasonable diligence, would have brought home to him. Daniel v. Tolon, 53 Okla. 666, 157 Pac. 756, and cases cited. Section 2926, Rev. Laws 1910, provides that every person who has actual notice of circumstances sufficient to put a prudent man on inquiry as to a particular fact, and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself. What record, then, was there, or what circumstances existed sufficient to charge notice of the fraud in procuring the Wallace Jack deed? The deed on its face, we have seen, was a quitclaim deed and purports to convey 160 acres of land for a consideration of $50.

The order of approval of this deed was filed in the county court on February 21, 1913, and recorded in Full-Blood Record Conveyances, No. 1, at page 342, though the date of record we have been unable to find. L. J. Burt, attorney at law, testified that he represented John Z. Cacy in procuring the approval of the original Orla Fulsom deed; that, after the suit by Wallace Jack was filed, Cacy and the parties interested with him in the lands came to his office and procured the dismissal of the pending suit and a deed from Jack to Cacy. On cross-examination the witness testified that Cacy's brother, "and perhaps Mr. Canfield and Mr. Mogan," were interested in the transaction. Canfield, being asked if there was any litigation on the land at the time he bought it, testified that "there was none at the time I bought the first forty."

The contract between Wallace Jack and McDougal & Lytle of January 22, 1913, was both approved by the county court and filed in the office of the register of deeds on January 22, 1913. This contract recites that Wallace Jack was the owner of the lands in controversy, though not in possession thereof. Its purpose was, as disclosed by its terms, the recovery of the lands, or at least his interest therein. The petition filed in the suit brought by him on January 24, 1913, was a matter of public record, as was the subsequent motion to vacate and set aside the dismissal on account of fraud charged to have been practiced on him by the defendants in the action. After the court had overruled his motion to vacate and set aside the dismissal on May 31, 1913, and on the 5th day of June, following, McDougal & Lytle brought suit in the district court of Creek county, against John Z. Cacy, Thomas Mogan, Geo. W. Canfield, and Orla Fulsom, for the enforcement of their attorneys' contract with Wallace Jack. In the petition it was charged that Wallace Jack was the legal and equitable owner of, and had the fee simple estate in, and was entitled to the immediate possession of, the lands in question. The instruments mentioned were all of record, and the McDougal & Lytle suit against Cacy pending, long prior to the various conveyances to Canfield, Waller, Peteet, Grimes, Lancaster, and Cosden. No new conveyance was ever executed by John Z. Cacy to the 40 acres first conveyed to Canfield, or to the 40 acres sold to Mogan, or to Cosden, Mogan's grantee, after Cacy had procured his deed from Wallace Jack; hence the only title which he could have conveyed to that portion of the land included in their respective deeds was whatever interest he had acquired through his purchases from the maternal heirs.

There was also of record in the district court of Creek county the petition filed in case No. 3142, Mollie Tiger and Babie Barnett v. Geo. W. Canfield, John Z. Cacy, Leroy J. Burt, Roy Shaha, Wallace Jack, D. A. McDougal, L. O. Lytle, and C. J. Wrightsman, wherein it was charged that the defendants, including Wallace Jack, claimed some right, title, or interest in the lands, adverse to plaintiffs, and were in adverse possession thereof. This case was dismissed on plaintiffs' motion on January 21, 1914. Thereafter a motion was filed, and later on an amended motion, to set aside the order of dismissal on the ground of fraud practiced upon them by John Z. Cacy, Geo. W. Canfield, and their agents, including F. S. Lozier. While the motion was overruled, an appeal was prosecuted therefrom to the Supreme Court, and petition in error filed on August 25, 1914, where the cause remained pending until settled by the parties on March 27, 1917. The petition in error named, as a defendant in error, Lusanna Brink, sole heir at law of Wallace Jack, deceased, though the date of her being made a party to the proceedings does not appear. On the 19th day of September, 1914, all of the heirs to the Susie Crow allotment, other than Lolly Jack, entered into an agreement inter sese and with John Z. Cacy, Rhoda Cacy, Leroy J. Burt, Samuel Waller, McDougal & Lytle, Maurice E. Peteet, Geo. W. Canfield, Roy Shaha, Ira E. Cornelius, Clara A. Ryan, and Walter L. Ransom, for a consideration paid by G. M. Canterbury, lessee, for the payment of delayed rentals and royalties to the American National Bank of Sapulpa to be by it held in trust pending the final termination of the litigation relating to the lands in question and the leases thereon. This contract was approved by the county court on September 23, 1914, and duly recorded. The agreement recites that all parties thereto claim some right, title, or interest in and to the lands therein described, and to oil and gas leases thereon, and were engaged at the time in litigating the title thereto in the district court of Creek county. This agreement was put of record prior to the taking of the deed by Grimes and Lancaster to the 60 acres of land claimed by them, and prior to the purchase by Cosden of the Mogan 40-acre tract on May 3, 1915.

John Z. Cacy, being a party to the transaction through which his deed from Wallace Jack was obtained, is, of course, bound by his acts, or those of his authorized agents. There is little, if any, question that both Mogan and Canfield, who were parties defendant in the Wallace Jack case, were parties to the transaction. Indeed, we fail to find wherein the witness Burt's testimony

in this respect is controverted. Their only title to the south half of the southwest quarter was obtained through conveyances from the grantee of the maternal heirs, as the subsequent deed from Wallace Jack to Cacy was voidable, at least as to those having knowledge or who were charged with notice of the rights of Wallace Jack or his heirs. As to the defendants Grimes, Lancaster, Waller, and Peteet, and Canfield's undivided one-half interest in and to the south half of the southwest quarter of the southeast quarter, each of them was charged with notice of Jack's title and the title that passed to his mother, Lusanna Brink, upon his demise. The record to which we have referred, if not others, fairly bristles with notice of the claims of the heirs. The lands were notoriously involved in litigation. Oil and gas leases in large numbers had been executed thereon by some of the heirs, and others claiming to be heirs. It was in order to drill the lands and remove therefrom the rich deposits of oil and gas that the agreement of September 19, 1914, was judiciously entered into. This agreement was followed by a contract made between the different heirs, attorneys, lessees, and assignees, with C. J. Wrightsman, on December 1, 1914, and which lease in part was assigned by Wrightsman to David Gunsburg and the Southwestern Petroleum Company on December 9th, following. Prior to the purchase by Grimes, he visited Sapulpa, talked with Burt and Shaha, Cacy's attorneys, and with Walter L. Ransom, and testified that he personally gave four days to an examination of the abstract.

Obviously, defendants either knew, or had constructive notice of, the facts attending the making of the deed from Jack to Cacy on February 17, 1913, and of the former's rights in the premises. The public records were open to them and the slightest examination thereof would have disclosed not only the prior, but the subsequent, claims of Jack to the lands. In transactions affecting the property, the purchasers thereof were chargeable with notice that he was an heir, and entitled as such to participate in the enjoyment of his inheritance, for it was incumbent on one who is about to purchase real estate to ascertain the true owner or owners. Up to the very day of his death, Jack had asserted his claim of heirship. It is true that he had fraudulently been induced to make a quitclaim deed of his heritage; but this act he promptly attempted to rescind, and to return the miserable consideration paid him for the dismissal of his suit, which, the trial court found, "would have resulted in a judgment decreeing him to be the owner of an undivided one-fourth interest in said

lands in fee," meaning thereby the Susie Crow allotment. The extension of the Cushing oil pool in the direction of the Susie Crow allotment was indicated, and active drilling in the vicinity commenced in the spring of 1914, and about the time the second Canfield deed, and the deed to Waller and Peteet, were taken. This was several months before Grimes and Lancaster acquired the 60-acre tract, which, it will be recalled, was in the latter part of October. Naturally, land values were rapidly enhancing in value, and to own land favorably located was "a consummation devoutly to be wished." As then indicated, and as subsequent developments proved, the lands were of great value. Out of the one-eighth royalties coming into the hands of the receiver from the date of his appointment and the approval of his bond, July 16, 1916, to August 2, 1918, there has been collected the sum of $386,673.22, according to the receiver's report, filed August 6, 1918. Of course, we are to determine the case, not by the present or by the subsequent value of the land, but from its fair and reasonable value at the time. But we have seen that no valuation placed upon the land put it at less than $10,000, while there was testimony that placed it at a much larger sum.

In Moore v. Sawyer (C. C.) 167 Fed. 826, numerous conveyances made by one Moore, a Creek freedman citizen, were involved. The land was located in the well-known "Glenn Pool" district. Among other conveyances, Moore made to McCullough a quitclaim deed to 80 acres of land for $120. Two weeks thereafter, McCullough conveyed to O. M. Lancaster by warranty deed for a consideration of $1,200. The land at the time was reasonably worth $5,000. The quitclaim deed was ordered canceled for fraud in its procurement, and it was held that the purchaser of the grantee in the warranty deed was charged with notice of the facts which a reasonable inquiry would have disclosed, and was not therefore a bona fide purchaser, but took subject to the equities of the original grantor. The opinion cites in its support: Smith v. Phillips, 9 Okla. 304, 60 Pac. 119; American Emigrant Co. v. County of Wright, 97 U. S. 339, 24 L. Ed. 912; Simmons Creek Coal Co. v. Doran, 142 U. S. 437, 12 Sup. Ct. 246, 35 L. Ed. 1063; Pomeroy, Eq. Jur. sec. 600; 23 A. & E. Ency. of Law (2d Ed.) 495.

We have seen that plaintiff in error is not contesting the decree in favor of McDougal & Lytle; and that, pending the appeal, the issues between Lolly Jack and plaintiff in error have been adjusted and settled. The decree in favor of McDougal & Lytle will

therefore be affirmed. As to the question of ad valorem taxes upon the funds in the receiver's hands, presented by motion in this court, the trial court, upon a remand of the case, is directed to determine all issues involving liability of the funds to taxation, of which it may have jurisdiction, whenever that queston may properly be triable.

The judgment of the trial court that Lusanna Brink had no interest in the lands and that she take nothing, and that her cross-petition be dismissed with prejudice, is reversed, but without prejudice to the rights as lessees or sublessees, of Chas. J. Wrightsman, Ralph Hochstetter, special administrator of the estate of David Gunsburg, deceased, and the Southwestern Petroleum Company, under an agreement of the parties of September 14, 1914, and contract with Wrightsman of December 1, 1914, and assignment of December 9, 1914, to Gunsburg and the Southwestern Petroleum Company. The district court will take such further proceedings as may be necessary or proper in the premises and as may be adequate in affording full relief according to the rights of the respective parties.

All the Justices concur, except OWEN, C. J., not participating.