**McDANIEL, Adm'r, et al. v. SCHROEDER.**

No. 17488. Opinion Filed Nov. 22, 1927.

(Syllabus.)

1. **Contracts—Transaction Induced by One in Confidential Relation—Presumptions and Burden of Proof as to Validity.**

Where the parties stand in the relationship of trust and confidence and the party in whom the confidence is reposed obtains an apparent advantage over the other in a transaction between them, such transaction is presumed to be void, and the burden of proof is upon the party who seeks to support it to show by clear proof that he has taken no advantage of his influence and that the transaction is fair and conscientious.

2. **Descent and Distribution—Evidence Warranting Cancellation of Deed and Contract of Elderly Widow Induced by Stepchildren.**

Where, in an action to set aside a quitclaim deed and contract conveying real property, the evidence discloses that the plaintiff, an elderly woman, was in a highly nervous and exhausted state physically due to her constant nursing day and night of her helpless and irresponsible husband for a matter of weeks, and also in the deepest distress from the death of said husband, and that on the day following his burial the stepchildren, between whom and the plaintiff there were the closest bonds of affection and confidence, gave the plaintiff to understand that a settlement between the parties of the entire estate was highly needful, and that without such settlement she could not occupy the home longer, and that they would look after her interests and treat her right, whereupon they caused papers to be drawn up and signed by her, conveying all her inherited interest in the estate to them and reserving only to herself the right to occupy the homestead upon conditions inserted in the contract but which were never mentioned to her, and where it appears, further that she was not relying upon her own judgment, but upon the insistent demands of said children, and by reason whereof she sought no other advice, and where it appears that the said children secured an apparent advantage due to the confidence reposed in them by plaintiff, and that said settlement was unfair and oppressive, it was not error for the court to set aside and hold for naught the contract and quitclaim deed.

**3. Cancellation of Instruments—Delay of Two Years in Bringing Suit Held not Laches.**

Where the condition of the parties and property has remained unchanged, plaintiff is not guilty of laches in waiting almost two years to bring her action when it is made to appear that her delay was occasioned by her grief and worry over the loss of her husband, her unfamiliarity with business affairs, and her confidence in the promises of her stepchildren that they would treat her right in settling her deceased husband's estate.

**4. Same—Cancellation of Instruments Sustained.**

Record and evidence in this case examined, and it is held, that the court did not err in setting aside the contract and quitclaim deed.

Commissioners' Opinion, Division No. 1.

Error from District Court, Pawnee County; Luther James, Judge.

Action by Hetta Schroeder against H. F. McDaniel, administrator of Faye McDaniel, deceased, and others, to set aside a quitclaim deed and a contract respecting real estate as without consideration and void on account of fraud. From a judgment for plaintiff setting aside said instruments, defendants appeal. Affirmed.

L. V. Orton and Womack, Brown & Cund, for plaintiffs in error.

McCollum & McCollum, for defendant in error.

BENNETT, C. Plaintiff, Hetta Schroeder, sued defendants to set aside a quitclaim deed and a contract involving real estate. Plaintiff recovered below, and the parties will be referred to as they were designated in the trial court.

Plaintiff's petition alleged that she was the widow of George H. Schroeder, deceased, and that the defendants are children of decedent by a former marriage; that decedent died seized of certain lots in Jennings, Okla. and also a quarter section of land and one-third interest in another quarter in Pawnee county, Okla., all owned by decedent at the time of his marriage with plaintiff; that decedent had three children, who, together with this plaintiff, are his sole heirs; and that the lots above referred to constituted the homestead; that the contract and quitclaim deed sought to be set aside herein were executed by plaintiff at the same time, and constituted one transaction; that the same are inequitable and void because the defendants took advantage of the plaintiff's confidence at the time, and under circumstances when she was incapable of exercising sound judgment. Her evidence on this issue tends to show that George H. Schroeder, her husband, died on Monday night, February 12, 1923, after a very long illness, during which time plaintiff was with him practically day and night without interruption. This was made necessary by the physical and also by the mental condition of the sick man, who had to be nursed like an infant, and that plaintiff, on that account never left him; occupied, when she was permitted to lie down, the same bed with him, in order that she might be present at his every call. The proof is convincing that she was a most faithful and self-sacrificing wife, and that the long vigil reduced her almost to a physical wreck. She was highly nervous and almost overcome by her grief and sorrow with respect to which there is no dispute. It further appears that plaintiff was most affectionate towards and had a genuine love for the defendants, her stepchildren, and they, in turn, seemed to accord to her the same sincere affection. Her testimony was to the effect that she loved them like her own children and they seemed to return her devotion; that upon the death of her husband, his body was kept in the home until the interment on Wednesday, and, on Thursday, Mrs. McDaniel, and perhaps others of the children, suggested that they settle up the estate by contract, as they lived some distance away. Plaintiff demurred because she did not feel like talking business then, and because she was worn out and nervous, but it was insisted that the settlement be had, and it was insisted also that it was the wish of the decedent. Plaintiff said that she was in such condition that she could not think right did not have a chance to think, and finally the plaintiff told them that if it was their wishes she would take nothing out of the estate; that she thought that the children would treat her right and relied upon them to do so, and, at last, upon their insistence, agreed to settle; that she had never had any friction with defendants and that she relied upon them as if they were her own; that she did not know her legal rights; that she was 52 years old, and, that while she acted as guardian for her children, she did not know the law with reference to the property. She understood, and was given to understand by the children, that unless she signed the contract and quitclaim, or some other instrument of similar import, she would not be permitted to remain in the home, and that she would have to vacate the same. The defendants told her they would have the

papers drawn up, and, on Saturday morning following, Mrs. McDaniel handed her the papers which had been prepared at Oilton the day before by an attorney at the instance of Mr. McDaniel and Joe Schroeder, in the absence of plaintiff; that she looked at the papers, but did not read them, and also tried to look them over on the way to Pawnee where they were going in a Ford car to pay the burial expenses, but she could not read them as they were very dim; but she said that she trusted the children to treat her right as they had so often promised; that immediately following payment of the burial expenses she executed a contract, but has no recollection of seeing or executing the quitclaim deed, but that the signature thereto is her signature.

The written contract provides, in substance, that in consideration of the mutual covenants plaintiff should have the exclusive use and control of the homestead "so long as the following conditions shall exist, to wit: That said first party shall be and remain the widow of said George H. Schroeder, deceased; shall reside upon said property; shall keep the same in repair; shall keep the same insured for a reasonable amount; and shall keep the taxes paid, tax receipts to be surrendered to second parties. Providing that if all the above conditions shall continue to exist until the death of the said party of the first part, then, in that event, the said party of the first part hereby grants the said above described property to the said parties of the second part, their heirs and assigns."

It is further provided that, as consideration for the occupancy of the homestead, the plaintiff waived all right, title or interest in and to the balance of the real property, and does, by the terms of said instrument, transfer, bargain, sell and convey unto the said parties of the second part (defendants), their heirs and assigns, all the right, title and interest of the first party, which shall pass to her by virtue of having been the wife of said decedent. The quitclaim deed follows the terms of the contract and conveys plaintiff's interest in all the real estate except the reserved right in the homestead.

It conclusively appears from the evidence that the several conditions set out in the contract were never discussed by the parties, nor contemplated by them. It appears that the decedent left $500 in his savings account, and also about $180 in the checking account. There was given the plaintiff the checking account of $180, less taxes amounting to about $89, a Ford car, and only a part of the household goods, and defendants took the certificate of deposit for $500, and plaintiff got none of it. It appears that plaintiff was given scant time, even if she had the mind, to examine into and take advice concerning these papers, and it appears that she relied wholly upon the statements of the defendants and trusted them completely, and it appears to the court that she was peculiarly susceptible to their influence and suggestion at the time of her grief and exhaustion, and it is not strange that she leaned heavily and trustfully upon those near her. ·

The testimony on the part of the defendants tends to contradict plaintiff's testimony on some points: it tends to show that plaintiff was not worn out or exhausted, but was in normal condition; that she read or partially read the papers on the way to Pawnee, which was more than 20 miles from her home, and that she did not wish any interest in the farm, and also that the plaintiff, herself, wished the settlement made. Upon consideration of all the testimony, the court found for the plaintiff and adjudged that the contract and quitclaim deed should be canceled and held for naught.

The motion for new trial contains six grounds, the assignment of error eight specifications, but the argument on appeal is confined to the one vital point, as to whether or not the pleadings and evidence are sufficient to support the judgment. Defendants contend: First, that in an equitable action this court should weigh the evidence; second, that where fraud is alleged in the procurement of a written instrument, the proof should sustain the allegation by a weight sufficient to preponderate and overcome the opposing presumption that the parties dealt fairly; third, that inadequacy of consideration alone is seldom sufficient to justify setting aside a deed; fourth, that a mere mistake of law, accompanied with no other circumstance demanding equitable relief, constitutes no ground for cancellation. It will be readily conceded that these propositions state the law in the abstract, and the cases thereon cited by defendants are persuasive and controlling upon the propositions to which they are addressed.

But there enters into the consideration of this case a vital element which is not present usually in controversies of this kind. It is that peculiar element which arises out of confidential relations. The controversy here arose between types which are exceptional, rare enough indeed to be almost

unheard of, a stepmother, kind, considerate, affectionate, and self-sacrificing, and step-children, who apparently loved, revered and respected this companion of their father in his later years. There is usually present under these circumstances coldness, aloofness, distrust and even suspicion. One cannot read this record, however, without being convinced that the plaintiff reposed in these children the very utmost of motherly confidence and trust. She says that she loved them and trusted them as if they were her very own. There had never been confusion during the years, nor lack of motherly affection; they addressed her as "Mother Schroeder," although they were of full age and heads of their own households. The record is complete to the effect that she relied upon their advice and counsel and adhered graciously to their suggestions, and seemingly with never a thought of selfishness in the settlement out of which arose the written contracts, the subject of this action. The principal inquiry, therefore, is: Were these parties standing in confidential relations? This record compels us to answer this issue in the affirmative. What, then, is the law governing contracts entered into between persons occupying that relation?

"The term 'fiduciary or confidential relation,' as used in this connection, is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is Does such a relation in fact exist?" 2 Pom. Eq. Jur., sec. 947.

"Whenever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed." 2 Pom. Eq. Jur. (3d Ed.) sec. 956.

These two citations are referred to with approval in the case of Ewing v. Ewing, 33 Okla. 414, at page 424, 126 Pac. 811, and in the case of Moore v. Crawford 130

U. S. 122, 9 Sup. Ct. 447, 32 L. Ed. 878, the court said:

"It is the settled doctrine of the court that where the conveyance is obtained for ends which it regards as fraudulent, or under circumstances it considers as fraudulent or oppressive, by intent or immediate consequence, the party deriving title under it will be converted into a trustee, in case that construction is needful for the purpose of administering adequate relief; and the setting up the statute of frauds by a party guilty of the fraud or misconduct, in order to bar the court from effective interference with his wrongdoing, will not hinder it from forcing on his conscience this character as a means to baffle his injustice or its effects."

This doctrine has likewise been approved in Logan v. Brown, 20 Okla. 334, 95 Pac. 441.

"While equity does not deny the possibility of valid transactions between parties where a fiduciary relationship exists, yet, because every such relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with the equitable requisites, and of thereby overcoming the presumption. The broad principle on which the court acts in cases of this description is that wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in which confidence or trust is reposed to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him." Parker v. Parker, 75 Okla. 234, 182 Pac. 697.

In Jones on Evidence, vol. 2, p. 104, the rule is stated in substance that, where such relations exist, the burden of proof shall fall upon the person benefited to show that the confidential relation has been, as to that transaction, suspended, and that it was as fairly conducted as between strangers.

See, to the same effect, 1 Perry on Trusts, section 166; 3 Pom. Eq. Jur. sec. 1053; In re Spann, 51 Okla. 309, 152 Pac. 68.

"So, if the parties stand in a relation of trust and confidence, and the party in whom the confidence is reposed obtains an apparent advantage over the other in a transaction between them, such transaction is presumed to be void, and the burden of

proof is upon the party who seeks to support it to show by the clear proof that he has taken no advantage of his influence or knowledge and that the arrangement is fair and conscientious." 12 R. C. L. 427, and cases cited.

The same doctrine is found in Clinton v. Miller, 77 Okla. 173, 186 Pac. 933; Daniel v. Tolon, 53 Okla. 666, 157 Pac. 756; Brink v. Canfield, 78 Okla. 189, 187 Pac. 223.

In the case at bar, we have an old-fashioned woman, old in years, and worn to the point of almost utter exhaustion by a vigil which was pathetic and unusual, and with mind and heart torn by almost unbelievable grief; she is called upon, not of her own choosing, to talk business—almost in the presence of her dead—to decide whether or not the estate should be settled **instanter,** so that these more nimble-minded sons and daughters might get away more quickly from the house of grief. Her simple answer is that, "I do not feel like talking settlement, I have neither the mental strength nor disposition," and yet the matter is persistently pressed upon her attention, and she was given to understand that she should settle now, or she would not be allowed to stay in her old home, and, finally she says in her extremity, "If you wish me to take nothing, I will take nothing." She was met with the oft-repeated promise that the heirs would do her right, would take care of her, and the good old soul believed it, and signed, without question, what they put before her. She did not even read it and the evidence of defendants would, we think, indicate that she did not read it, although they contend now to the contrary. If she read the papers when they were first handed to her, a few minutes before she started to Pawnee, why should she have attempted to look them over as she jolted over an unpaved road in a Ford on the way to Pawnee?

Another proof that she did not read them is that she did not know and they did not disclose to her the condition in the contract that, if she married again (may we interpolate, what a time it was to suggest to this woman marrying again!), or if she failed to pay the taxes and deliver the tax receipts to these younger and more alert heirs, or if she removed, even temporarily from the premises, or if she failed to keep the premises insured, or if she failed to keep the same in repair, the property, upon such breach, would pass to such heirs. Those were substantial provisions and conditions which limited or were intended to limit her estate; but so far as this evidence goes they were never discussed with her. Whence came they? If they were suggested by the lawyer who drew the papers, he was not brought before the court to clear up the matter. The inference is inescapable—those matters were never drawn to plaintiff's attention.

What was the **consideration** for this transfer? As a matter of law she was entitled **without condition** to the homestead. She agreed to receive it subject to many conditions. She was entitled as a matter of law to a year's allowance, either out of the money or property. She received nothing except $80 cash and a second-hand Ford. There is in the record sufficient proof to indicate that for some years this farm land was within potential oil territory, and yet, with all the sacrifices, with all of her devoted attention to her husband, she is given, by the terms of this enforced settlement, by those whom she loved and trusted, substantially less than the law would have given her. She received a less interest in the homestead and no consideration for her interest in the other real estate. The Ford car is not even mentioned as a consideration in the contract, and probably the same belonged as much to her as to her husband, for it seems he had been disabled for several years.

It is contended finally that the widow is guilty of **laches** in not bringing the suit earlier. So far as the proof goes, there has been no change of condition. The defendants have not changed their position and the widow had very little to change. Her explanation of the delay was that she was borne down by her grief and worry, and that she hesitated to speak about it; that she trusted that the children would do her right, and having discovered that they would not, she appealed to the court.

We have carefully weighed and examined all the evidence, and we are of the opinion that the finding of the trial court for the plaintiff and that the contract and quitclaim deed herein be set aside and held for naught, should be, and the same is, in all respects, approved, and the judgment is therefore affirmed.

TEEHEE, REID, LEACH, and FOSTER, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 9 C. J. p. 1252, §190: 13 C. J. p. 406, §330; 12 R. C. L. p. 427; 4 R. C. L. Supp. p. 759; 5 R. C. L. Supp. p. 644. (2) 9 C. J. p. 1256, §195; 4 R. C. L.

p. 493; 1 R. C. L. Supp. p. 1147. (3) 9 C. J. pp. 1200, 1201, §81. (4) 9 C. J. p. 1170, §26; p. 1256, §195.