### PROBST v. HUGHES et al.

No. 18962. Opinion Filed Jan. 28, 1930.

Rehearing Denied April 15, 1930.

Harry L. S. Halley and Geo. A. Hoke, for plaintiff in error.

Wilcox & Swank, for defendants in error.

TEEHEE, C. Plaintiff in error, Geo. C. Probst, sued defendants in error, R. C. Jones, T. J. Hughes and Thomas N. Berry, for an accounting of one-sixteenth of the oil, gas, and casinghead gas produced from a certain leasehold accruing from a fixed time. The transactions giving rise to the suit were as follows:

On April 23, 1918, Julia C. Payne and H. H. Payne, fee owners, made an oil and gas lease on a certain tract of land to W. M. Williams for a term of five years and as long thereafter as oil or gas, or either of them, was produced from the leased premises by the lessee. Among other terms there was a royalty provision of one-eighth of the oil production and $300 each year, payable in advance, for the gas from each well where gas only was found while the same was used off the premises.

On June 25, 1918, the lease was assigned to plaintiff and James B. Morrison. On October 13, 1922, plaintiff and Morrison assigned the lease to defendant Hughes. In that assignment assignors reserved an overriding royalty in the following language, to wit:

"Now, therefore, in consideration of the payment of the sum of $1, the receipt of which is hereby acknowledged, the undersigned, George C. Probst and James B. Morrison, do hereby sell, assign, transfer, set over and convey unto T. J. Hughes, his successors and assigns, the above-described lease, reserving however, to themselves free of cost in the pipe lines to which said lease may be connected, a one-eighth share of all the oil or gas and casinghead gas produced from said lands by the said assignee, its successors or assigns, which one-eighth share of such oil and gas and casinghead gas, the assignors herein may at their option, sell at

the same price and on the same terms and conditions as the assignee may secure for its share of such oil and gas and casinghead gas. It is specifically understood and agreed that such one-eighth share hereby reserved is not one-eighth of the working interest in said lease after deduction of the one-eighth royalty to the lessor in said lease, but that this one-eighth hereby reserved constitutes such share of the entire gross production from said lands. This reservation shall likewise apply as to all modifications, renewals of such lease, or extensions that the assignee, his successors, or assigns may secure.

"By the acceptance of this conveyance, the said assignee hereby consents to and agrees to be bound by the aforesaid reservation and to comply fully therewith."

On December 15, 1922, defendant Hughes assigned a seven-thirty-seconds interest therein to defendant Berry. On the same date defendant Hughes assigned a like interest to defendant Jones.

By appropriate pleadings plaintiff alleged these transactions, and that defendants have produced from the leasehold a large amount of the mineral referred to under the lease, or renewal, modification or extension thereof, and that they have refused and failed to pay plaintiff his one-sixteenth share of the proceeds of the sale of such minerals, the exact amount being to plaintiff unknown, and accordingly prayed judgment in such sum as may constitute his one-sixteenth share thereof.

Defendants, by separate answers, in effect, admitted the record transactions affecting the title to the property as pleaded by plaintiff. In defense they alleged termination of the lease in accordance with its terms, which was to the effect that there was gas being produced from the leased premises at the end of the primary term on April 23, 1923, which continued the lease in force until about June 1, 1924,

"when the well producing the same ceased to produce any gas whatever and was plugged, and said lease thereon by its terms automatically became terminated and of no further force and effect; that no oil or gas was ever afterwards produced under the terms of said lease or under any extension or modification thereof."

Replying to the new matter contained in the answers, plaintiff alleged that defendants, on April 23, 1924, paid to the lessor or his assigns the advanced annual rental of $300 for the producing gas well which, in effect, extended the lease for a period of one year from that date; that during that period defendants, on October 28, 1924, secured another lease on the premises from the grantees of the lessor which, in effect, was an extension or a renewal of the original lease; that at the time of securing the new lease, defendants, by virtue of plaintiff's assignment to defendant Hughes, occupied the relation of trustee to plaintiff, and thus the new lease was charged with his overriding royalty; that defendants have produced oil and gas from said premises subsequent to the taking of the new lease, and have refused to pay over to plaintiff his one-sixteenth portion of the income derived from the production of such minerals.

Upon the issues framed by the pleadings, a trial was proceeded with before a jury. At the conclusion of the presentation of the evidence by both parties, the defendants moved for a directed verdict, which was by the court sustained and such verdict returned, and thereupon judgment was rendered for defendants, of which plaintiff complains.

The question involved in this appeal is whether or not the second lease was brought within the terms of plaintiff's assignment as being a renewal or an extension of the original lease, and thus charged with plaintiff's overriding royalty of a one-sixteenth interest in the oil and gas produced from the leased premises subsequent to the execution of the second lease.

Plaintiff proceeds on the theory that at the time the second lease was taken by the defendants from the then fee owners of the property, the original lease was still in force and effect by virtue of the payment of the annual rental of $300 for the productive gas well notwithstanding that the same ceased in production and was plugged during the annual term, and thus the defendants occupied the relation of trustees to plaintiff, and could not appropriate the property for themselves in the manner as was done, and escape liability for the payment of plaintiff's one-sixteenth overriding royalty interest in the oil and gas produced subsequent to the taking of the second lease.

Defendants contend that, as the well mentioned ceased in production during the annual term, the lease thereupon automatically terminated, which operated as a termination of plaintiff's overriding royalty, and that as the second lease was entered into subsequent to such termination, it constituted an independent transaction unaffected by plaintiff's claim of an overriding royalty interest therein.

There is no dispute as to the facts. In the territory of the lease there existed three producing gas sands. In the well on the old

lease, the first sand was found at 1,900 feet, which continued productive until sometime during the first annual period for which the first gas rental of $300 was paid when it was deepened. The second sand was found at 2,200 feet, and about June 1, 1924, during the second annual rental period, the well went to salt water, at which time defendants contend that the lease then terminated though they afterwards deepened the well but found salt water at 2,600 feet. They thereupon plugged the well. Either during the time of plugging the well, or immediately afterwards, defendants negotiated the second lease. Of defendants' plans in either relation, plaintiff was not informed.

The new lease was drawn to plaintiff's assignee and his privies, who during the life of the well, had acquired Morrison's one-sixteenth overriding royalty. By letter, about October 28, 1924, the date of the new lease, one of defendants sent the lease to the fee owner in Texas, who executed the same on November 10, 1924. At that time there were several producing gas wells from the shallow sand on three tracts adjoining the leased premises. The new lease was for a primary term of three years, with a renewable six months' development provision after the first year, and a royalty of one-eighth of oil and gas, and otherwise varied in several of its terms from the old lease, which variance defendants urge supports their point that the new lease was an independent transaction and not a renewal or an extension of the old lease.

There was no actual surrender of the premises by defendants, and, at the time of execution of the new lease, the fee owner, to whom the annual gas rentals had been paid, did not consider the old lease as then having been terminated.

It is fairly to be inferred from the record that defendants believed that there could be found on the premises a still deeper sand known to the oil and gas industry as the Bartlesville sand, and that the remainder of the annual gas rental year after deepening the well to 2,600 feet was too short a time to make the deeper test, and that the new lease would afford them ample time for further exploration.

It is to be observed that upon the first cessation of the gas production during the first annual gas rental period, defendants by their acts in deepening the well did not then consider the lease as at an end, and did not by like acts so treat the lease upon the second cessation, which it seems to us renders their contention of termination as being without a predicate. Defendants having paid the annual gas rental for the period of one year from April 23, 1924, they were free of any other demand upon them by the fee owner in Texas during such time, and thus as between the parties to this action, the original lease under the record must be regarded as subsisting for that period of time.

In these circumstances, therefore, we think, as is contended by plaintiff, that the case is brought within the oft-repeated rule found in many cases and standard legal treaties which is admirably expressed in Trice v. Comstock, 121 Fed. 620, 57 C. C. A. 646, 61 L. R. A. 176, to wit:

"Wherever one person is placed in such a relation to another by the act or consent of that other, or by the act of a third person, or of the law, that he becomes interested for him, or interested with him, in any subject of property or business, he is in such a fiduciary relation with him that he is prohibited from acquiring rights in that subject antagonistic to the person with whose interests he has become associated."

Of the general application of the rule, the court used this language:

"This inexorable principle of the law is not based upon, nor conditioned by, the respective interests or powers of the parties to the relation, the times when that relation commences or terminates, or the injury or damage which the betrayal of the confidence given entails. It rests upon a broader foundation, upon that sagacious public policy which, for the purpose of removing all temptation, removes all possibility that a trustee may derive profit from the subject-matter of his trust, so that one whose confidence has been betrayed may enforce the trust which arises under this rule of law although he has sustained no damage, although the confidential relation has terminated before the trust was betrayed, although he had no legal or equitable interest in the property, and although his correlate who acquired it had no joint interest in or discretionary power over it. The only indispensable elements of a good cause of action to enforce such a trust are the fiduciary relation and the use by one of the parties to it of the knowledge or the interest he acquired through it to prevent the other from accomplishing the purpose of the relation. And, within the prohibition of this rule of law, every relation in which the duty of fidelity to each other is imposed upon the parties by the established rules of law is a relation of trust and confidence. The relation of trustee and cestui que trust, principal and agent, client and attorney, employer and employee, who through the employment gains either an interest in or a knowledge of the property or business of his master, are striking and familiar illustrations of

the relation. From the agreement which underlies and conditions these fiduciary relations, the law both implies a contract and imposes a duty that the servant shall be faithful to his master, the attorney to his client, the agent to his principal, and trustee to his cestui que trust, that each shall work and act with an eye single to the interest of his correlate, and that no one of them shall use the interest or knowledge which he acquires through the relation so as to defeat or hinder the other party to it in accomplishing any of the purposes for which it was created."

In Clements v. Cates, 49 Ark. 242, 4 S. W. 776, the court states the rule in this language, to wit:

"The law forbids a trustee and all other persons occupying a fiduciary, or quasi fiduciary position, from taking any personal advantage touching the thing or subject as to which such fiduciary position exists; or, as expressed by another. 'Wherever one person is placed in such relation to another, by the act or consent of that other, or the act of a third person, or of the law, that he becomes interested for him or interested with him in any subject of property or business, he is prohibited from acquiring rights in that subject antagon'stic to the person with whose interest he has become associated.' If such a person acquires an interest in property as to which such a relation exists, he holds it as a trustee for the benefit of those in whose interest he was prohibited from purchasing, to the extent of the prohibition."

In the application of the principle to lease transactions, a standard author has this to say, to wit:

"Another special form of constructive trusts, depending upon a much more general principle to be examined in subsequent paragraphs, has been established by a unanimity of decision. One member of a partnership cannot, during its existence, without the knowledge and consent of his copartners, take a renewal lease, in his own name or otherwise, for his own benefit and to the exclusion of his fellows, of premises leased by the firm or occupied by them as tenants. A lease so taken by a partner inures to the benefit of the whole firm; it is regarded as a continuation of or as 'grafted on' the old lease; a trust will be impressed upon the leasehold estate; equity will treat the partner as a trustee for the firm and if necessary and possible, will compel him to assign the renewal lease to it; if a condition inserted in such lease against assigning should prevent the relief of an actual assignment, it will not in the least prevent the court from enforcing the trust by compelling the partner to hold the legal title for the benefit of all. This rule applies under every variety of circumstances, provided the rights of the other partners are still subsisting at the time when the renewal lease is obtained. It operates with equal force whether the renewal lease was to begin during the continuance of the firm or after its termination; whether the partnership was for an undetermined period, or was to end at a specified time, and the renewal lease was not to take effect until the expiration of that prescribed time; whether there was or was not a right in the firm, by contract, custom, or courtesy, to a renewal of the original lease from the lessor; and even whether the landlord would or would not have granted a new lease to the other partners or to the firm. All these facts are wholly immaterial to the application of the doctrine, for its operation does not in the slightest degree depend upon the terms and provisions of the original lease, nor upon the attitude of the landlord. The doctrine is not confined to partners; it extends in all its breadth and with all its effects to trustees, guardians, and all other persons clothed with a fiduciary character, who are in possession of premises as tenants on behalf of their beneficiaries, or who are in possession as tenants of premises in which their beneficiaries are interested. As this rule results from the relation of trust and confidence existing between the partners or other persons interested, it might be regarded as an outgrowth of the doctrine formulated in the preceding paragraph. It is more directly, however, a particular application of a broad principle of equity, extending to all actual and quasi trustees, that a trustee, or person clothed with a fiduciary character, shall not be permitted to use his position or functions so as to obtain for himself any advantage or profit inconsistent with his supreme duty to his beneficiary." 3 Pomeroy's Equity Jurisprudence (4th Ed.) p. 2392, sec. 1050, with numerous citations.

In Phyfe v. Wardell (N. Y.) 5 Paige, 268, 28 Am. Dec. 430, the doctrine in this relation is summed up in the following language:

"If a person who has a particular or special interest in a lease obtains a renewal thereof from the circumstance of his being in possession as tenant, or from having such particular interest, the renewed lease is in equity considered as a mere continuance of the original lease, subject to the additional charges upon the renewal, for the purpose of protecting the equitable rights of all parties who had any interest, either legal or equitable, in the old lease."

It is thus to be seen that a trusteeship may arise by virtue of any relationship of the parties in which it may be said that the one occupying the position of trustee is in duty bound to act in the utmost good faith for the benefit of the other. We think that relation here existed. Under the terms of plaintiff's assignment, defendants were under the obligation to exercise the utmost good

faith to secure a renewal or an extension of the lease, if they desired to continue to further prospect the property for oil or gas as was the case under the facts disclosed by this record.

In Lonabaugh v. Midwest Refining Company (D. C.) 285 Fed. 63, a situation existed which in many phases was similar to the cause here. In that case it appeared that the owner of an oil and gas lease in assignment thereof to another reserved an interest in which, in respect to the reservation, it was provided as follows:

"It is expressly agreed and understood that this contract of assignment covers and is to be extended to and have full operation over any and all renewals of the lease between the state of Wyoming and the party of the second part, heretofore referred to and made a part hereof, in the event any renewal thereof is secured by either of the parties hereto."

The assignee before the expiration of the original lease applied for a renewal. The lessor refused to renew the lease, and in lieu thereof entered into an operating agreement. One of the questions involved was whether or not the operating agreement constituted a renewal of the original lease so that plaintiff's interest attached to the agreement by virtue of the provision of the assignment referred to. The court followed Trice v. Comstock, supra. It was held:

"Where assignment of oil and gas lease from the state provided that it should cover any renewal thereof secured by either of the parties, one claiming under the assignment, if it dealt with the state at all, was bound to use its best efforts to secure a renewal, and was in the position of a trustee toward the assignor to the extent, at least, that the assignor had a right to rely on its utmost good faith in securing a renewal, and was not relieved of its obligation as trustee merely because the state would not renew the lease, but gave an operating agreement largely partaking of the nature of a lease.

"Where oil and gas lease from the state and operating agreement made to begin on termination of the lease were between the same parties, affected the same property, provided for physical operation in the same manner, and were in other respects substantially alike, the fact that the lease required payment of a royalty, while the operating agreement required payment of a stipulated percentage of the proceeds of sales, and made the operator the agent of the state, held not to render inapplicable a provision in an assignment of the lease that it should cover any renewal secured by either party."

The principle as in that case was recognized in Goocey y. Hopkins, 206 Ky. 176, 266 S. W. 1087, though it was there held to be inapplicable. The facts were that a lessee assigned a lease to another, in which assignment it was provided that the assignee did convey to the assignor an interest in the lease equal to a one-sixteenth part fully paid up. There was no provision in respect to a renewal. The assignee undertook no development, but on the expiration of the lease took another lease from the owner of the property in his own name as lessee. This lease was assigned to others who forthwith commenced operations and reduced to possession and control oil in paying quantities. The assignor of the old lease sought an accounting against his assignee, the lessee in the second lease and his assignees, for the one-sixteenth part of the monies derived from the operation under the second lease. The court took the view that as the assignor of the original lease was under no obligation to renew or extend the lease, the assignee was likewise under no such obligation unless he was so obliged under the terms of the assignment, and there being no such provision therein contained, plaintiff could not recover.

We are of the opinion, therefore, that under the record in this case, the new lease constitutes a renewal or an extension of the original lease within the meaning of the assignment and is charged with the overriding royalty interest of plaintiff. This conclusion, however, does not fully dispose of the case, as it appears that certain evidence in respect to the accounting apparently was intended to have been produced by plaintiff upon the establishment of defendants' liability. Plaintiff having lost, this was not done, and therefore we cannot determine the amount of this liability.

Accordingly, the judgment of the district court is reversed, and the cause remanded, with directions to the trial court to vacate the judgment, and take such further proceedings in accounting as may be necessary, and thereupon render judgment for plaintiff in such sum as the evidence establishes to be the amount of defendants' liability in the premises.

BENNETT, REID, LEACH, and JEFFREY, Commissioners, concur.

By the Court: It is so ordered.

Note.—See "Mines and Minerals," 40 C. J. §747, p. 1115, n. 34.