### HIVICK v. URSCHEL et al.

No. 24501.  Jan. 29, 1935.

Rehearing Denied March 5, 1935.

John Barry, Nowlin, Conner & Conner, Claude Nowlin, M. M. Thomas, J. R. Spiel-man, and R. P. Hill, Jr., for plaintiff in error.

Stokes, Jarman & Brown, George W. Grant, R. J. Price and J. B. Dudley, for defendants in error.

OSBORN, V. C. J. This action was filed in the district court of Oklahoma county by L. C. Hivick, hereinafter referred to as plaintiff, against C. F. Urschel, Arthur Seeligson, and Berenice Slick, as executors and trustees of the estate of Thomas B. Slick, deceased, hereinafter referred to as defendants, wherein plaintiff seeks to recover on a claim against the estate of T. B. Slick, deceased, in the sum of $44,800 arising through the alleged breach of a contract between plaintiff and the deceased. The cause was tried to the court and a judgment rendered for defendants, from which plaintiff appeals.

The pertinent provisions of the contract are as follows:

"This agreement made and entered into on this 10th day of April, A. D. 1924, by and between L. C. Hivick of Oklahoma City, Oklahoma, and hereinafter designated party of the first part, and T. B. Slick of Clarion, Pennsylvania, and hereinafter designated as party of the second part;

"Witnesseth

"Whereas, party of the first part is the owner of oil and gas mining leases covering the following described property, to wit: (description of various leases, including the lease involved herein) which oil and gas lease he is desirous of selling to party of the second part; and,

"Whereas party of the second part is willing to purchase said oil and gas mining leases upon the terms and conditions hereinafter set out.

"Now, therefore, for and in consideration of the sum of forty-nine thousand eight hundred ($49,800.00) dollars to be paid as hereinafter provided, party of the first part hereby grants, bargains, sells and assigns to party of the second part, oil and gas mining leases which he owns and which cover the above described property, said assignments to be made as of the 11th day of February, 1924, as to the commercial leases, and of even date as to the departmental leases, and agrees to furnish abstracts showing good and merchantable title in and to said oil and gas commercial leases and certificate that the departmental leases are in good standing.

"1. Party of the second part agrees to pay to party of the first part the sum of five thousand ($5,000.00) dollars in cash upon the execution of this agreement, and the balance of forty-four thousand, eight hundred ($44,800.00) dollars in oil, as hereinafter provided.

"2. Party of the second part further agrees to commence a well on one of the leases in Osage county, to be selected by him assigned to party of the second part by this agreement, within sixty (60) days from the date of the approval of assignments, covering the leases in Osage county, by the Secretary of the Interior and exercise due diligence in drilling said well to a completion and should oil be found in paying quantities, party of the first part is to receive one-half ($\frac{1}{2}$) of said oil until forty-four thousand eight hundred ($44,800.00) dollars payment, which he is to receive in oil, is fully paid; should the well be a dry hole, party of the second part is to pay the rentals and protect the leases as he shall think advisable. Should party of the first part fail to receive the sum of forty-four thousand, eight hundred ($44,800.00) from the first well drilled, then he is to receive one-half ($\frac{1}{2}$) of the oil or gas from any well drilled on any of the above described leases by party of the second part until he receives said sum.

"3. It is further agreed and understood by and between the parties hereto, that party of the second part shall assume, from the date of this agreement, the payment of the rentals due to be paid under the terms of the several leases assigned to him pursuant to this agreement; provided, that party of the second part may, at any time he sees fit, release any lease so assigned to him under this agreement, and cease paying rentals thereon, but before releasing same, he shall give to party of the first part, thirty (30) days' notice in writing of his intention to relinquish said lease, and party of the first part may within the thirty (30) days after receipt of said notice, request that said lease be reassigned to him, and upon the receipt of such request, party of the second part will reassign same to party of the first part."

The lease involved in this action was on the west half of the southeast quarter of section 12, township 8 N., range 5 E., covering 80 acres. The land belonged to a three-quarter blood Seminole Indian named Nellie.

The lease is referred to as the Nellie lease. Plaintiff had secured a lease on the land on July 29, 1916, for a period of 10 years.

Under the terms of the above contract plaintiff was paid $5,000 in cash, and the well was drilled on one of the leases in Osage county, but no oil was produced therefrom. On April 29, 1926, T. B. Slick executed a release of the above lease, which was recorded in Seminole county May 4, 1926, and filed with Indian Agency at Muskogee on June 3, 1926. Following is a regulation of the Interior Department applicable to the facts involved herein:

"Where there is an existing oil and gas lease covering restricted Indian land, no new oil and gas lease will be given favorable consideration unless executed and filed after the expiration of the former lease. In case of cancellation of the former lease or violation of its terms or on application of the lessee, a new lease to receive favorable consideration must be executed and filed after such cancellation is entered of record on the docket in the office of the Superintendent for the Five Civilized Tribes: Provided, that where application for cancellation of an existing lease is completed and filed by the lessee in the office of the Superintendent within the period of ninety days immediately preceding the expiration date thereof, such application will be held in the office of the Superintendent without action, and no new oil and gas lease will be given favorable consideration unless executed and filed after the expiration of the lease term."

Since the release was not filed by Slick within 90 days prior to the expiration of the lease, it was held in the Muskogee office without action and the lease expired by its own terms on July 29, 1926. On July 30, 1926, a new lease was executed to T. B. Slick from the Indian Nellie, which was subsequently approved by the Department of the Interior, and under this lease the property was developed.

On March 3, 1926, drilling was commenced on the property, and about that time Slick sold a one-half interest in the lease to the Prairie Oil & Gas Company and it took over the drilling operations. The first production was had in May, 1929.

T. B. Slick died on August 15, 1930. On March 31, 1931, plaintiff filed a claim against the estate. On April 4, 1931, the claim was rejected. On June 29, 1931, this action was filed.

It is noted that under the terms of the above contract Slick was required to give to plaintiff 30 days' notice of his intention to cancel or release any of the leases involved in said contract. It is agreed that no such notice was given to plaintiff. In this connection the trial court found that the release filed by Slick was not effective, since it was not filed more than 90 days prior to the expiration of the lease and the lease expired by its own terms.

Considerable evidence was introduced relating to plaintiff's financial ability to drill a well on this property if he had been notified according to the terms of the contract of the intention of Slick to file the release, but the trial court found plaintiff was financially able at that time to drill a well. As to whether or not there was sufficient time after the release was filed to complete a well on the property, the testimony is in serious conflict, and the trial court made no finding in this regard; but, under the view we take of this case, we think these issues immaterial.

Plaintiff contends, first, that the trial court erred in his finding of fact to the effect that the lease expired by its own terms. It is contended that the interest of Slick in the lease terminated when the release was filed, and the fact that the release was not transmitted to Washington and accepted by the Department did not result in the expiration of the lease by its own terms. In this connection it is shown that when a release is filed on a lease of this nature prior to the time it expires by its own terms, the lessee is released from payment of rental for the particular year, and in this case, although the release was not transmitted to Washington, by filing the same Slick was not required to pay the $80 rental due on the date the lease expired. We do not think this question is controlling.

Plaintiff also contends that by virtue of the contract involved herein and the contingencies arising thereunder, there was created a trust relationship in the new lease, and that Slick held an undivided one-half interest therein in trust for plaintiff to the extent that it was necessary to satisfy the amount due plaintiff as stipulated in the contract. It is also contended that a confidential relationship existed between Slick and plaintiff, and by reason thereof, under the facts as they developed herein, a trust was established in the new lease to the extent of the interest plaintiff would have acquired therein had oil been discovered and

produced prior to the expiration of the lease which plaintiff transferred to Slick; while defendants contend that the relationship between the parties is purely contractual and that no trust relationship could exist under the facts in this case.

A fiduciary relationship is one in which, if a wrong arises, the same remedy exists against the wrongdoer on behalf of the principal as would exist against a trustee on behalf of the cestui que trust. The relation exists under a great variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence. It arises whenever a trust, continuous or temporary, is specially reposed in the skill or integrity of another. Courts of equity have refused to set any bounds to the circumstances out of which fiduciary relations might spring. It extends to every possible case in which there is confidence reposed on one side and resulting in domination or influence on the other. The origin of the confidence and the source of the influence are immaterial. See Reeves v. Crum, 97 Okla. 293, 225 P. 177; McDaniel v. Schroeder, 128 Okla. 91, 261 P. 224; Lewis v. Schafer, 163 Okla. 94, 20 P. (2d) 1048; Moore v. Crawford, 130 U. S. 122, 32 L. Ed. 878; Central Nat. Bank v. Conn. Mut. Life Ins. Co., 104 U. S. 54; Lindholm v. Nelson (Kan.) 264 P. 50; Quinn v. Phipps (Fla.) 113 So. 419, 54 A. L. R. 1173; 25 C. J. 1119.

Adverting to the contract herein involved, it is noted that the major portion of the consideration for the assignment of the leases was to be paid in oil which was conditioned upon the development of the leases assigned. Under the terms of the contract it was incumbent upon Slick to drill a well upon a certain lease in Osage county, but it was provided in the event said well was a dry hole the consideration was to be paid from any other production that might be had on the other leases. The ultimate object sought to be accomplished by both parties was the development of the various leases involved in the contract. Until there was such development, the major portion of the consideration could not pass to Hivick. To the extent of the unpaid consideration, Slick became the trustee of an express trust and was bound to discharge his duty and obligation to his cestui que trust with fidelity in strict conformity to

his obligation under the contract. It was his duty, in the event he desired to release his rights under any of said assigned leases to give to Hivick the notice provided by the contract, and upon request, to reassign same to Hivick. This he did not do. Instead he filed with the department, and in the county clerk's office, a release of any rights he had acquired under the assigned lease, and effectively divested himself of power to comply with his written agreement with Hivick. Had he reassigned the lease, as agreed, Hivick would have had the right to go upon the lands and drill a well, which the trial court found he was financially able to do, and oil might have been produced during the term of the lease, which would have operated to extend its terms indefinitely during production. Thus the ultimate expressed object of the contract on the part of Hivick—the payment of the balance of the consideration by development of the property—was thwarted.

One Mrs. Alice B. Davis, one-time Governor of the Seminole Tribe of Indians, testified for plaintiff to the effect that several days before the lease expired she was hired by W. N. Stokes, attorney for Slick, to take charge of the Indian Nellie, who was a fullblood Indian and could not speak or understand English, and secrete her so that no one else would have access to her for the purpose of securing a lease; that she was paid by Stokes to perform this service and that she did secrete the Indian Nellie, and allowed no one to approach her for the purpose of procuring a lease, and on the day after the lease expired Mr. Stokes appeared and secured the lease. The greater part of this testimony was denied by Stokes, and without weighing the testimony, we are forced to the conclusion that some plans and arrangements were made prior to the expiration date of the lease to secure a new lease for Slick on the lands covered by the former lease.

As to whether or not such a course of conduct on the part of Slick operated to impress a constructive trust in favor of Hivick upon the new lease acquired by him, we turn to the authorities. In this connection we find some difficulty in finding a case directly analogous from the standpoint of facts. However, we find many pronouncements of the law relating to the broad general principles of equity which are entirely appropriate to the controversy at hand.

The case of Probst v. Hughes, 143 Okla. 11, 286 P. 875, 69 A. L. R. 929, presents a

state of facts somewhat similar to the facts involved herein. Therein we find the following discussion:

"In the application of the principle to lease transactions, a standard author has this to say, to wit: 'Another special form of constructive trusts, depending upon a much more general principle to be examined in subsequent paragraphs, has been established by unanimity of decision. One member of a partnership cannot, during its existence, without the knowledge and consent of his copartners, take a renewal lease, in his own name or otherwise for his own benefit and to the exclusion of his fellows, of premises leased by the firm or occupied by them as tenants. A lease so taken by a partner inures to the benefit of the whole firm; it is regarded as a continuation of or as "grafted on" the old lease; a trust will be impressed upon the leasehold estate; equity will treat the partner as a trustee for the firm, and if necessary and possible, will compel him to assign the renewal lease to it; if a condition inserted in such lease against assigning should prevent the relief of an actual assignment, it will not in the least prevent the court from enforcing the trust by compelling the partner to hold the legal title for the benefit of all. This rule applies under every variety of circumstances provided the rights of the other partners are still subsisting at the time when the renewal lease is obtained. It operates with equal force whether the renewal lease was to begin during the continuance of the firm or after its termination; whether the partnership was for an undetermined period, or was to end at a specified time, and the renewal lease was not to take effect until the expiration of that prescribed time; whether there was or was not a right in' the firm, by contract, custom, or courtesy to a renewal of the original lease from the lessor; and even whether the landlord would or would not have granted a new lease to the other partners or to the firm. All these facts are wholly immaterial to the application of the doctrine, for its operation does not in the slightest degree depend upon the terms and provisions of the original lease, nor upon the attitude of the landlord. The doctrine is not confined to partners; it extends in all its breadth and with all its effects to trustees. guardians, and all other persons clothed with a fiduciary character, who are in possession of premises as tenants on behalf of their beneficiaries, or who are in possession as tenants of premises in which their beneficiaries, are interested. As this rule results from the relation of trust and confidence existing between the partners or other persons interested, it might be regarded as an outgrowth of the doctrine formulated in the preceding paragraph. It is more directly, however, a particular application of a broad principle of equity, extending to all actual and quasi trustees, that a trustee, or person clothed with a fiduciary character, shall not be permitted to use his position or functions so as to obtain for himself any advantage or profit inconsistent with his supreme duty to his beneficiary.' 3 Pom. Eq. Jur. (4th Ed.) p. 2392, sec. 1050, with numerous citations.

"In Phyfe v. Wardell, 5 Paige, 268, 28 Am. Dec. 430, the doctrine in this relation is summed up in the following language: 'If a person who has a particular or special interest in a lease obtains a renewal thereof from the circumstance of his being in possession as tenant, or from having such particular interest, the renewed lease is, in equity, considered as a mere continuance of the original lease, subject to the additional charges upon the renewal, for the purpose of protecting the equitable rights of all parties who had any interest, either legal or equitable, in the old lease.'

"It is thus to be seen that a trusteeship may arise by virtue of any relationship of the parties in which it may be said that the one occupying the position of trustee is in duty bound to act in the utmost good faith for the benefit of the other. We think that relation here existed. Under the terms of plaintiff's assignment, defendants were under the obligation to exercise the utmost good faith to secure a renewal or an extension of the lease if they desired to continue to further prospect the property for oil or gas as was the case under the facts disclosed by this record."

We quote from the body of the opinion in the case of Testerman v. Burt, 143 Okla. 220, 289 P. 315, as follows:

" 'Whenever one person is placed in such relation to another, * * * or the act of a third person or of the law, that he becomes interested for him, or interested with him, in any subject or property or business, he is prohibited from acquiring rights in that subject antagonistic to the person with whose interest he has become associated.' Chamness v. Collopy, 90 Okla. 71, 215 P. 953. * * *

" ' "Constructive trusts" are such as are raised by equity in respect to property which has been acquired by fraud, or where, though acquired without fraud, it is against equity that it should be retained by him who holds it.' Rollow v. Taylor, 104 Okla. 275, 231 P. 224'."

" 'Constructive trusts are raised by equity for the purpose of working out right and justice, where there was no intention of the party to create such a relation, and often directly contrary to the intention of the one holding the legal title. All instances of con-

structive trust may be referred to what equity denominates fraud, either actual or constructive, including acts or omissions in violation of fiduciary obligations.' Cassidy v. Hornor, 86 Okla. 220, 208 P. 775."

In the case of Rose v. First Nat. Bank of Stigler, 93 Okla. 120, 219 P. 715, it is said:

"Where a transaction has its inception in a fiduciary relationship, the mere fact that the relation is temporarily suspended does not relieve the person acting in such fiduciary relation in the beginning of the transaction from exercising the utmost good faith toward the corporation in the final settlement growing out of the transaction so commenced by virtue of the trust relation."

In the case of Hayden v. Dannenberg, 42 Okla. 776, 143 P. 859, it is said:

"Where a party obtains the legal title to property, not only by fraud or by violation of confidence, or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain it against the rightful owner, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner."

In the case of Wells v. Cline, 19 Ohio App. 165, it is said:

"Whenever one person confides his property to the dominion of another, and relies upon the integrity of such other to do nothing to impair the interests confided to him, a fiduciary relationship arises between such parties.

"When the owner of an oil leasehold assigns the lease to another under an agreement that the property shall be developed for the benefit of both parties to the assignment, the assignee cannot acquire rights therein antagonistic to his assignor, and when he acquires such rights, a court of equity will charge the interests so acquired with a trust in favor of the assignor."

For a further discussion of the principle and its application, see Lonabaugh v. Midwest Refining Company, 285 Fed. 63; Trice v. Comstock, 121 Fed. 620, 57 C. C. A. 646, 61 L. R. A. 176.

By the terms of the contract herein involved, Slick was bound to exercise the utmost good faith in the development of the lease prior to its expiration. In the event he decided to relinquish the lease, he was bound by the express terms of the contract to give Hivick 30 days' notice and reassign the lease to him on request. It is admitted that this obligation was breached. By reason of the breach no development could be had prior to the expiration date. Thus the breach resulted to defeat the purpose of the contract. Had the lease been developed by Slick prior to its expiration date, Hivick would have received $44,800. To the extent of the loss to Hivick, there was a corresponding profit to Slick.

It is contrary to the principles of equity to allow a trustee to profit by a breach of his trust at the expense of a cestui que trust. In order to provide a remedy to apply to such an inequitable situation, the doctrine of constructive trusts was created by the courts of equity. This doctrine is applicable and appropriate and must be applied to the facts in this case. The new lease taken by Slick was impressed with a trust in favor of Hivick to the extent that it was necessary to pay to him that portion of the consideration that was to be paid out of oil production.

It is not necessary to, nor do we, predicate the conclusion in this case upon any actual fraudulent act, intention, or conduct on the part of Slick in this transaction. There was never any express repudiation by him of his trusteeship in connection with this lease or any others assigned by plaintiff to him. But for his death it may be that this litigation would have been avoided. Nor is there criticism of the conduct of his executors and trustees. Their duties are highly fiduciary in safeguarding the assets of the estate against dissipation or improper claims.

The judgment of the trial court is reversed, with directions to enter judgment in favor of plaintiff for the amount prayed, with interest at 6 per cent. from date of rejection of the claim presented to the executors, together with a lien upon funds arising from said lands, and any interest in said lease owned by the said estate of T. B. Slick, deceased, and the future production therefrom.

McNEILL, C. J., and RILEY, BAYLESS, PHELPS, CORN, and GIBSON, JJ., concur. BUSBY and WELCH, JJ., absent.