**WARNER BROS. THEATRES, Inc. v. COOPER FOUNDATION et al.**

No. 4192.

United States Court of Appeals, Tenth Circuit.

May 29, 1951.

D. I. Johnston, Oklahoma City, Okl., and Harold Berkovitz, New York City (Edward E. Soule, and Keaton, Wells, Johnston & Lytle, all of Oklahoma City, Okl. were with them on the brief), for appellant.

M. W. McKenzie, Oklahoma City, Okl., and John C. Mason, Lincoln, Neb. (H. Barney Crawford, Oklahoma City, Okl., and Kenneth E. Anderson, Lincoln, Neb., were with them on the brief), for appellees.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

Warner Brothers Theatres, Inc., brought this action in the District Court of Oklahoma County, Oklahoma, seeking to impress a constructive trust upon a ten year lease covering the Liberty Theatre in Oklahoma City. The original defendants were J. H. Cooper, the Cooper Foundation, and the Standard Theatres Corporation. There was a diversity of citizenship between the parties and the case was removed to the United States District Court for the Western District of Oklahoma. Later, by order of the court, J. N. Harber and Mary Harber, owners of the property, were made party defendants. No service was had upon the defendant, Cooper, and Standard Theatres Corporation filed no answer. The trail court denied the relief sought and entered judgment for the defendants from which judgment this appeal was taken.

On May 1, 1915, the property upon which the Liberty Theatre now stands was leased to the Midwest Enterprise Company, a corporation, by the then owners. This lease was for ten years with renewal options for periods of five years, extending through June 30, 1945. On June 24, 1930, Warner Brothers acquired control of the theatre through a sublease. On April 6, 1934, the Harbers purchased the fee to the property subject to the lease. In 1940, prior to the time for exercising the last five year option, there were negotiations between the lessee and the Harbers which resulted in an extention of the existing lease through June 30, 1950. Warner Brothers obtained a sublease from the lessee for the same period.

In 1933, Warner Brothers was operating a number of theatres in Oklahoma City. At the same time Criterion Theatre Corporation and Regal Theatre, Inc.,[1] operated other theatres there. The stock in Warner was all owned by Warner Brothers Pictures Inc., while Cooper and Paramount Pictures owned the stock in Criterion and Regal equally. On September 1, 1933, Warner, Criterion, Regal and Cooper entered into contracts wherein it was agreed that a management corporation known as Standard Theatres Corporation would be organized to manage, control and operate the theatres of the three corporations in Oklahoma City. Employment agreements between Warner, Criterion and Regal with Standard, and between Standard and Cooper, were prepared and executed. Cooper was to be the president and general manager of Standard until his death, disability or retirement or at the expiration of the agreement on June 29, 1950. He was to have full charge and management of all the theatres of the three corporations in Oklahoma City. He was authorized to employ assistants, and if these assistants performed duties and

---

1. These corporations are referred to herein as Warner, Criterion and Regal.

services which ordinarily should have been performed by Cooper, they were to be paid by Cooper and not Standard. These employment agreements were attached to the original pooling agreement of September 1, 1933, which set forth fully the purposes for which Standard was organized, and limited its functions to the actual operations of the theatres. Cooper and the stockholders of Standard were prohibited from holding, leasing, operating or becoming interested in any theatrical enterprise in Oklahoma City, except the theatres named in the agreement. The control of Standard over the theatres was limited to their operation. It had no responsibility or duty in connection with the leases or subleases which the different corporations owned, with the renewals or extensions thereof, with the obtaining of new leases, or with any part of the buildings except that actually used in the theatre business. At the time the contracts were entered into, Cooper had extensive theatre interests in Colorado and Nebraska. It was recognized that these interests would continue and that Cooper would give a portion of his time to them.

In 1934, Cooper had organized in Nebraska a charitable corporation known as the Cooper Foundation. The articles of incorporation of the Foundation show that its purpose was charitable in nature;[2] its affairs were to be conducted by trustees of not less than three nor more than twelve. The original trustees were selected by Cooper, thereafter the selections were made by the trustees. Those selected were all outstanding citizens of the State of Nebraska. Cooper became a member of the Board and was its President during his lifetime. The Foundation, through gifts from Cooper, acquired assets valued at over $3,000,000. These assets consisted mostly of interests in motion picture theatre properties, although Cooper made large personal cash contributions. By the terms of a contract, Cooper managed the properties and assets of the Foundation. He made suggestions for investments and charitable contributions which were usually followed by the Board.

Pat McGee, an employee of the Foundation, a long time friend and associate of Cooper, in July, 1945, while in the military service, learned that the Harbers desired to sell the Liberty Theatre property and that other parties were interested in acquiring it by purchase or lease. Cooper, then in New York, was advised of this and some time thereafter entered into negotiations with representatives of the Harbers to purchase or lease the property. In October a ten year lease, with an option to purchase, was tentatively agreed upon between the Harbers and Cooper. Cooper had been in ill health for some time and, during these negotiations, made a trip to Colorado and Nebraska, at which time he advised McGee and others, including an attorney who was conducting the negotiations between Cooper and the Harbers, that

2. "III. The object for which this corporation is organized is for the purpose of maintaining funds secured by bequests, gifts, donations, or otherwise, for such charitable purposes as may be designated by a majority of its Board of Trustees, which purposes may include research, investigation, and experimentation with a view to ascertaining charitable needs of persons resident in the United States, with particular reference to persons resident of Lancaster County, Nebraska.

"That paragraph III be amended by adding thereto the following: 'For the purposes above specified and any other charitable purpose, or to obtain funds or income for charitable purposes, it may contract for, purchase, receive, manage, hold and dispose of real, personal and mixed property, wheresoever situated, by gift, grant, devise, bequest or purchase and may operate said properties or any part thereof, or any business it may acquire in any location, in the name of the corporation, or in any other manner and for its benefit and in its behalf through such persons or agents as it may designate or select from time to time by majority action of the Trustees, but without any person by reason of membership or position as Trustee or officer of said association becoming entitled thereby to any special dividend or benefit out of the funds thereof, depending on such membership.' "

he had decided to drop out of the deal.[3] The fact of ill health was evidenced by his death within a few months. Sometime after this visit, McGee, knowing that other parties were interested in acquiring the property, and that time was important, went to New York to consult Cooper about submitting the proposition to the Foundation. Cooper advised him that he had no objection to the Foundation acquiring the property if the trustees of the Foundation deemed it advisable. McGee went directly from New York to Lincoln, Nebraska, where he met with the trustees who authorized him to proceed with negotiations for the lease on behalf of the Foundation. The lease and option to purchase agreed upon was in almost identical terms as the one submitted to Cooper, the principal exception being that the Harbers required a five year guarantee of rentals instead of the two years which would have been required of Cooper. It is this lease upon which Warner seeks to impress a constructive trust for its benefit, claiming that Cooper and McGee were its fiduciaries through employment by Standard.

█ In its answer the defendant, Foundation, pleaded that the pooling arrangement of 1933 whereby Standard was to take over and manage as a unit the theatres of Warner, Criterion and Regal, was in violation of the Federal Anti-Trust Act,

(15 U.S.C.A. §§ 1–7) (commonly known as the Sherman Act), contrary to public policy, illegal from its inception, and may not be relied upon in a court of equity for relief. Warner does not attempt to uphold the validity of these contracts but states that this action does not seek to enforce the contract or any provision thereof nor does it seek damages for the breach of the same. It states that if the court should grant the relief asked for in this action, such relief would not assist or aid in any manner a violation of the law. The agreement, which included the employment of Cooper to manage all the theatres in the pool, plainly created a monopolistic condition and eliminated all competition between the parties and was illegal and void on its face. Schine Chain Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. Paramount Pictures, D.C., 66 F.Supp. 323, affirmed 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. The pooling arrangements were abandoned in July of 1946 immediately following the Paramount decision in the United States District Court for the Southern District of New York.

█ Warner contends that even though the pooling arrangement was illegal, the illegality is not available to the Foundation as a defense. It relies upon cases

3. Judge Everest who conducted most of the negotiations on behalf of the Harbers, testified:

"Q. Now, did Mr. Cooper take into consideration your proposed lease?—A. Yes; the last time we talked, he was still interested and the next time I saw him he told me that while he thought it was a good proposition and the terms of the lease were rather favorable to him as lessee if he went into it, he was going into it. He definitely had given up the idea of taking it personally, but he said that The Cooper Foundation which he had previously told me about having created, might be interested and the matter would be referred to them and if they wanted to consider the matter, it would be taken up with Dr. Harber through me and Mr. McNeil direct. From that time on, I didn't hear anything direct from Mr. Cooper except that they had entertained the proposition and were willing

to enter into the lease. I am not sure but what Mr. McNeil told me about that.

"Q. You say 'they'—You refer to The Cooper Foundation?—A. Yes.

"Q. Then the matter was submitted to The Cooper Foundation?—A. Yes; that's correct. After he had withdrawn from the matter, I informed Dr. Harber that Mr. Cooper had decided not to go through with the deal, but there was a possibility that The Foundation would accept the lease as I had prepared it.

"Q. About that time, Mr. McGee came into the picture?—A. He had been in it right along, but I dealt more with him and no longer with Cooper. I understood that Mr. McGee was the representative in the deal of The Foundation.

"Q. Did you have any dealings at all with Mr. Cooper then after the matter was submitted finally?—A. None at all."

which have impressed constructive trusts upon property even though the acts of the parties were illegal, for to do otherwise would permit one party to profit by a wrong and be unjustly enriched. We do not think this case comes within that rule. The contracts upon which Warner relies to create the fiduciary relationship were in violation of statutes designed to protect the public, and were illegal and void from the beginning regardless of the corrupt intention of the parties. Scott v. Beams, 10 Cir., 122 F.2d 777, 784, certiorari denied 315 U.S. 809, 62 S.Ct. 794, 86 L.Ed. 1208; Price v. Marcus, 199 Okl. 356, 185 P.2d 953. While this is not an action to enforce or recover on an illegal contract the only right which the plaintiff has, the only right it could have, grows out of one. Without it there would have been no relationship, fiducial or otherwise, between Warner, Standard, Cooper, or McGee. Without the illegal arrangement, competition would have continued to exist in Oklahoma City between the theatres operated by Warner, Criterion and Regal, and Cooper would have been free to obtain the lease for himself or anyone else. The plaintiff pleaded the contracts which constituted the illegal arrangement. It could not make its case without proving them.

We do not have a case of unjust enrichment of Cooper or the Foundation because without the illegal contract Cooper or the Foundation would have been competitors of Warner and could have taken the lease. To uphold Warner's contention would permit it to take advantage of an admittedly illegal arrangement and obtain a lease upon this theatre for ten years while the evidence indicated it would not have been able to obtain it from the owner. A court of equity should not permit such manipulation of its rules. Warner relies upon our decision in Ohio Oil Co. v. Sharp, 10 Cir., 135 F.2d 303, 307. We find no assistance to Warner's position there. In that case, after explaining that equity would grant relief only to those who "come with clean hands and right conduct", this court said the rule "does not extend to misconduct which is unconnected with the matter in litigation, and with which the party who

asserts the maxim as a defense to his wrong has no concern." There, the General Geophysical Company had been employed by the Ohio Oil Co. to make geophysical surveys and seismographic tests. An unfaithful employee of the Geophysical Company gave confidential information to Sharp, a third party, who then obtained leases upon lands which the General had surveyed and made tests for the Ohio. This information belonged to Ohio, not the General Geophysical Company. One of Sharp's defenses was that the information had been unlawfully obtained by Ohio through trespass upon lands of third parties. It is clear that the alleged unlawful acts in that case could have been of no concern to Sharp.

It is established law in Oklahoma that where a plaintiff cannot establish a cause of action without relying upon an illegal contract, the courts will deny relief on such a cause of action. Cook v. Morrison (Okl.), 217 P.2d 810, 814; Price v. Marcus, supra; Stanolind Oil & Gas Co. v. Phillips, 195 Okl. 377, 157 P.2d 751, 752; Sigmon Furniture Mfg. Co. v. Massey, 192 Okl. 436, 137 P.2d 793, 794; McLain v. Oklahoma Cotton Growers' Ass'n, 125 Okl. 264, 258 P. 269, 272; Beams v. Young, 92 Okl. 294, 222 P. 952, 953; Missouri Fidelity & Casualty Co. v. Scott & Scott, 72 Okl. 59, 178 P. 122; Citizens' National Bank v. Mitchell, 24 Okl. 488, 103 P. 720, 729. The Oklahoma rule is well stated in Crawford v. McConnell, 173 Okl. 520, 49 P.2d 551, at page 554, where it is said:

"It is elementary and fundamental law that courts will not enforce or aid in the enforcement of, a contract made in violation of law, and relief may properly be refused, even though the invalidity of the contract is not set up as a defense. * * * Nor can the plaintiff in an action prevail if, in order to recover, he is compelled to rely upon an illegal contract. 13 C.J. 502.

"While the case at bar is not, strictly speaking, an action to enforce a contract, the only right of plaintiff, if any, in the controversy arises out of the various contracts of employment between himself and the protesting taxpayers. * * * The re-

lief should not be granted at the plaintiff's request, nor should the indirect aid be extended to him by a court, unless the contracts from which his asserted right arises are legal. In order to establish any right to appear in this litigation, the plaintiff must and does resort to, and rely solely upon, his contracts."

The federal courts follow the same rule. Sola Electric Co. v. Jefferson Co., 317 U. S. 173, 63 S.Ct. 172, 87 L.Ed. 165; Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U.S. 227, 261, 29 S.Ct. 280, 53 L.Ed. 486; McMullen v. Hoffman, 174 U.S. 639, 648, 19 S.Ct. 839, 43 L.Ed. 1117; and in Bement & Sons v. National Harrow Co., 186 U.S. 70, 88, 22 S.Ct. 747, 754, 46 L.Ed. 1058, it is said: "As the statute makes the contract in itself illegal, no recovery can be had upon it when the defense of illegality is shown to the court. The act provides for the prevention of violations thereof, and makes it the duty of the several district attorneys, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations, and it gives to any person injured in his business or property the right to sue, but that does not prevent a private individual when sued upon a contract which is void as in violation of the act from setting it up as a defense, and we think when proved it is a valid defense to any claim made under a contract thus denounced as illegal."

In Scott v. Beams, supra, this court said 122 F.2d at page 784: "A contract which by its inherent tendency is inimical to public welfare or inconsistent with good morals violates public policy and will not be enforced, either directly or indirectly. The validity of a contract in point of being against public policy must be measured by its inherent tendency, not the good faith of the contracting parties or the manner in which they carried it out."

In the present case the Foundation was not a party to the pooling agreement but Warner's theory is that it was merely a device through which Cooper transacted his personal business. We think the pooling arrangement, which was in violation and void under the provisions of the Sherman Act, is the very heart of the action, and under the circumstances of this case may be relied upon by the Foundation as a defense in an equitable action.

The trial court held that there was no fiduciary relationship between Cooper or McGee and Warner. It also held that the Foundation was not the alter ego of Cooper and negotiated for the lease independent of Cooper.

■ As a general principle of law, a tenant in possession has an equitable right to expect that his lease will be renewed upon its expiration. While the lessee may not compel a landlord to renew the lease to him, equity will declare a constructive trust in a lease given to his fiduciary which deprives him of this expectancy. Wootten v. Wootten, 10 Cir., 151 F.2d 147, 161 A. L.R. 1027, certiorari denied 331 U.S. 835, 67 S.Ct. 1516, 91 L.Ed. 1848; Hivick v. Urschel, 171 Okl. 17, 40 P.2d 1077, 1081; Probst v. Hughes, 143 Okl. 11, 286 P. 875, 878, 69 A.L.R. 929; Washington Theatre Co. v. Marion Theatre Corp., Ind.App., 81 N.E.2d 688, 692; Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1; 32 Am.Jur., Landlord and Tenant, Sec. 990, 991; Restatement, Restitution, Sec. 195.

■ We find it unnecessary, however, to determine whether there was a fiduciary relationship between Warner and Cooper or McGee which would bring the case within the rule. We shall pass to the question of whether the Foundation was actually an instrument used by Cooper to conduct his private business, which, under the rules of equity, would prevent its acquisition and retention of this lease. A corporation is an entity entirely separate from the persons who organize and compose it but it has its limitations. Such separate identity may, in a proper case, be cast aside and disregarded if it appears that the corporation is merely the business conduit through which an individual does business, and to recognize the separate entity of the corporation would bring about a fraud upon third parties. Maloney Tank Mfg. Co. v. Mid-Continent Petroleum Corp., 10 Cir., 49 F.2d 146, 150; Mid-Continent Life Ins. Co. v. Goforth, 193

Okl. 314, 143 P.2d 154, 157; Sefton v. San Diego Trust & Savings Bank, Cal. App., 106 P.2d 974, 984; Restatement, Restitution, Sec. 174.

The trial court did look beyond the corporate entity of the Foundation to determine if it was such a device and found "that the undisputed evidence in the record in this case is, that J. H. Cooper did not, and was not, transacting business for himself in the name of Foundation. It further finds that J. H. Cooper did not participate in, and had no part, concerning the action of the Board of Trustees of Foundation in authorizing the execution of the lease agreement between it and Dr. Harber and wife." From an examination of the record as a whole, we cannot say that this finding is unsupported by substantial evidence or is clearly erroneous. There can be little doubt but that Cooper, from the creation of the Foundation, was its guiding light. He was its sole donor. It was to be his monument to posterity. The trustees naturally looked to him for advice in the handling of its affairs and employed him to manage its properties. As Sam Waugh, a trustee and secretary of the board, in speaking of the Foundation said, "It was Cooper's baby, the trustees were merely trying to help him raise it." This was far from a concession that the trustees had abdicated or that it was a device through which Cooper could transact his private business to the detriment of others. The evidence was all to the contrary.

The corporation did not issue stock. Cooper's right to the property owned by the Foundation was no more than that of any other trustee. So far as the record shows, Cooper made no claim that he had any ownership in the property he conveyed to it. Except for the management contract, the trustees were not obligated to do his bidding on any matters. This lease was obtained by McGee, an employee of the Foundation. It became the property of the Foundation, Cooper did not own it.

He could not dispose of it. He could not benefit from it. He could not control it except through the trustees.

It is urged that even though the Foundation was not the alter ego of Cooper, it knew of his fiduciary relationship with Warner, and when it took the lease it could obtain no more than Cooper himself could have obtained. The argument is an attempt to bring the case within the rule of Ohio Oil Co. v. Sharp, supra, but the rule there is not applicable. The determining factor in that case was the delivery of confidential information to a third party who received it and knowingly acted upon it. Here the lease was not the result of confidential information received from Cooper or McGee. The date of the expiration of the lease upon which Warner's sublease was based was a matter of public record. Cooper and McGee learned from third parties that the Harbers desired to sell or lease the Liberty property and that the same had been listed with a real estate broker for that purpose. It was public information, whether actually known by many persons or not. The financial reports published by Standard covering all the theatres in the pooling agreement had been sent to the Foundation for years. Aside from the management contract, Cooper and McGee, as directors of Criterion and Regal, were entitled to receive these reports. McGee had spent many years in the show business in Oklahoma City. He was thoroughly familiar with the Liberty and its operation from the day it opened. He knew it was well located and had always been a popular theatre. He needed no confidential information to advise his employer and he used none.

In addition, we are of the opinion, after a careful consideration of the entire record, that the equities of the case are not in favor of Warner and the decision of the trial court is correct.

Judgment is affirmed.