**INDEPENDENT GAS & OIL PRODUCERS, INC., Plaintiff-Appellant,**

v.

**UNION OIL COMPANY OF CALIFORNIA, Defendant-Appellee.**

**No. 80–1380.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted July 16, 1981.

Decided Jan. 21, 1982.

---

Richard C. Ford of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., for plaintiff-appellant.

John C. Moricoli, Jr., Oklahoma City, Okl. (Michael R. Wilson, Oklahoma City, Okl., with him on the brief), of Watson, McKenzie & Moricoli, Oklahoma City, Okl., for defendant-appellee.

Before BARRETT, DOYLE, and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

This diversity case involves examination of an oil and gas agreement under Oklahoma law. At issue is the validity of the claim of an overriding royalty interest by Union Oil of California (Union) in an oil and gas lease obtained by Independent Oil & Gas Producers, Inc. (Independent). The trial court upheld the claim, and we affirm.

The basic circumstances generating this appeal are not in controversy. In 1957, the owner of the minerals underlying a certain tract of land in Garfield County, Oklahoma, executed an oil and gas lease covering his interest (Lease I). Lease I was for a primary term of 10 years or so long as production continued. It was later assigned in its entirety to the predecessor of Union. Union contracted with the predecessor of Independent for the drilling of a test well on the premises. The agreement obligated Union to assign Lease I to Independent upon completion of the well; however, Union was to retain an overriding royalty interest in all petroleum products produced from the property. A test well was ultimately drilled on the leased tract in December 1965 and thereafter produced oil and gas in commercial quantities.

Pursuant to the terms of the agreement, Union assigned Lease I to Independent and reserved an overriding royalty. The assignment extended Union's royalty interest to "any modifications, extensions or renewals of the lease on subject lands." Rec., vol. II, Def. Ex. 6. The consideration received by Union for this assignment was the drilling of the test well and the retained royalty.

The test well yielded oil and gas continuously until it was shut in because of mechanical failure in late October 1976. At that time, the drilling operator discovered that the well's hole casing had collapsed. Inasmuch as the primary term of Lease I had already expired, the operator was concerned that permanent cessation of petroleum production might result in lease termination. Accordingly, after unsuccessfully attempting to correct the defect, the operator notified Independent of the test well problem and its ramifications:

> "[A]s of this date Eason Oil Company [operator] is attempting to renew or extend our existing 160 acre unit and hereby advising you of our intentions in order that you may desire to protect your like interest. We would appreciate you advising Eason Oil Company in the event that you do not elect or [sic] renew or extend your existing lease hold interest."

Rec., vol. II, Def. Ex. 7; vol. IX, at 59–60. On January 4, 1977, the operator requested authority to abandon the test well, and on September 26 the well was plugged.

Upon learning of the test well problem, Independent attempted to protect its leasehold. In mid-December 1976, Independent contacted D. E. Davis, Inc. (Davis) and requested that it secure Independent's interest by renewing or extending Independent's lease in the premises. Davis was a lease broker that had been employed by the well operator and certain others to similarly secure their interests.

On December 31, 1976, Davis obtained a lease in its own name (Lease II) covering the tract of land originally held under Lease I. Davis assigned Lease II to Independent in February 1977, after Independent threatened to sue Davis for unethical conduct. Independent apparently believed that Davis acquired Lease II while "acting on [Independent's] behalf." Rec., vol. IX, at 81. Davis maintained that it procured Lease II solely for its own account.

A new well was drilled on the property held under Lease II, and oil production was obtained in September 1977. Independent refused to recognize Union's overriding interest as attaching to Lease II, theorizing that the lease was not an extension or renewal of Lease I within the meaning of the parties' previous assignment.

Independent sued Union seeking to quiet title to the disputed royalty. Union counterclaimed, asserting that its royalty interest attached to Lease II. Following Independent's presentation of evidence, the trial court granted Union's motion for judgment under Fed.R.Civ.P. 41(b).[1] The court concluded that: (1) Independent intended to cheat Union out of its royalty interest; (2) Lease II was a renewal of Lease I to which the overriding royalty attached; (3) the attachment of the royalty to Lease II did not violate the rule against perpetuities; and (4) Davis was acting as Independent's agent when it acquired Lease II.

Independent attacks the judgment of the trial court, contending that: (1) Lease II was not a renewal of Lease I; (2) the finding of an agency relationship between itself and Davis is clearly erroneous; and (3) the rule against perpetuities bars attachment of the overriding royalty to Lease II.

## I

### THE RENEWAL ISSUE

The substantive law of the forum state Oklahoma controls whether Lease II is a

---

1. Rule 41(b) provides in pertinent part:
 "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. *The court as trier of the facts may then determine them and render judgment against the plaintiff* or may decline to render any judgment until the close of all the evidence."

renewal of Lease I because jurisdiction here is based upon diversity of citizenship between the litigants. *Erie Railroad v. Tompkins,* 304 U.S. 64, 76–78, 58 S.Ct. 817, 821–22, 82 L.Ed. 1188 (1938). Oklahoma courts have ruled that a lease assignment expressly subjecting lease extensions and renewals to an overriding royalty interest converts a new lease procured by the assignee into a renewal of the old one to which the reserved royalty attaches. *Hivick v. Urschel,* 171 Okl. 17, 40 P.2d 1077, 1081–82 (1935); *Probst v. Hughes,* 143 Okl. 11, 286 P. 875, 879 (1930). This rule has been applied even where the new lease did not issue until the old one had expired for lack of production. *See Rees v. Briscoe,* 315 P.2d 758, 760 (Okl. 1957); *Hivick,* 40 P.2d at 1079.

■ The fiduciary obligations impliedly created by the terms of such a lease assignment form the basis for the rule. Where an assignment provides that subsequent lease extensions and renewals are subject to an overriding royalty, the assignee stands as a quasi-trustee vis-a-vis the assignor and must exercise the utmost good faith in protecting the latter's interest in the leasehold. *See Hivick,* 40 P.2d at 1081; *Probst,* 286 P. at 877. Consequently, any attempt by the fiduciary-assignee to procure rights antagonistic to those of his assignor will be defeated. *See id.* Application of the rule is highly appropriate where the "continuing royalty" clause is a large part of the consideration for the assignment. See *Rees,* 315 P.2d at 763; *Hivick,* 40 P.2d at 1080. Similarly, if a fiduciary-assignee indicates that he considers the original lease alive and future petroleum production thereunder probable despite temporary cessation, then enforcement of the rule is particularly proper. *See Probst,* 286 P. at 877.

■ The facts of this case bring Lease II squarely within the purview of the principles previously outlined. The parties' lease assignment expressly subjects renewals and extensions of Lease I to the overriding royalty interest held by Union and thus triggers operation of the fiduciary rule. The propriety of the rule's application here is unquestionable inasmuch as the reserved royalty was an important part of the consideration received by Union for the assignment and Independent believed the lease to be lucrative despite temporary cessation. This latter fact is evidenced by Independent's attempted employment of Davis for renewal procurement and its threatened lawsuit against that broker for unethical conduct, as well as the testimony at trial of Independent's president:

> "Q Okay. You never had any intent to abandon the Courter Lease after the Courter # 1 well had casing problems, did you?
>
> A No, sir.
>
> Q You felt there were substantial reserves there, did you not?
>
> A Well, not being an engineer and not getting any reports from Eason Oil, I felt, but I had no definite knowledge of it."

Rec., vol. IX, at 56. The trial judge specifically found that Independent had attempted to cheat Union out of the royalty. We have reviewed the entire record in the case, and we cannot say that this conclusion is clearly erroneous. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969).

Given its continuing belief that the lease was valuable, Independent was obligated by its fiduciary relationship to preserve Union's overriding royalty interest. If Independent had immediately obtained Lease II in its own name without the intervention of Davis, it is clear under the Oklahoma law we have cited that Lease II would be a renewal of Lease I. In the circumstances of this case, Independent's fiduciary duty to Union bars it from using Davis' intervening lease as an excuse to preclude Union's overriding royalty. *Cf. Lonabaugh v. Midwest Refining Co.,* 285 F. 63, 66–68 (D.Wyo.1922). Consequently, it is irrelevant whether Davis was Independent's agent.

■ Contrary to Independent's assertions, we deem it immaterial that Union paid nothing additional for the new lease, for neither did the owners of the override in

*Rees, Hivick,* or *Probst.* Nor is it relevant that Independent was not responsible for termination of the original lease; in *Probst,* the well ceased producing gas and went to salt water. Finally, Union's claim is not precluded by the fact it waited a number of months after execution of Lease II to make the claim because in *Hivick,* 40 P.2d at 1079, the second lease was executed in July 1926, drilling was commenced in March 1929, and Hivick did not file a claim until March 1931.

We conclude that the trial court correctly determined Lease II to be a renewal of Lease I, to which Union's overriding royalty attached.

## II

### THE RULE AGAINST PERPETUITIES

 Oklahoma recognizes the common law rule against perpetuities as operable in the state. *Melcher v. Camp,* 435 P.2d 107, 112 (Okla.1967). The doctrine traditionally voids any property right which may *vest* more than twenty-one years after some life in being at the creation of the interest. *See, e. g., Cities Service Oil Co. v. Sohio Petroleum Co.,* 345 F.Supp. 28, 30 (W.D. Okla.1972). Significantly, the rule touches only contingent future interests; a presently vested interest is not subject to the rule even though actual possession or enjoyment of the same may be delayed for an indeterminable period of time. *Barnes v. Barnes,* 280 P.2d 996, 998–99 (Okla.1955).

 The rule against perpetuities does not preclude Union's overriding royalty from attaching to Lease II. The court below correctly determined that Lease II was a renewal of Lease I. Union's property interest in any renewals or extensions of Lease I vested at the time of its assignment to Independent and the rule against perpetuities is not operable in such a situation. *See Howell v. Cooperative Refinery Ass'n,* 176 Kan. 572, 271 P.2d 271, 275–76 (1954). Independent's contention in this regard is without merit.

Judgment affirmed.